45 F.3d 684
 148 L.R.R.M. (BNA) 2368, 63 USLW 2511,
129 Lab.Cas. P 11,276,
1995-1 Trade Cases P 70,888
 NATIONAL BASKETBALL ASSOCIATION; Atlanta Hawks, L.P.;
Capital Bullets Basketball Club, Inc.; Boston Celtics
Limited Partnership; Charlotte NBA Limited Partnership;
Dallas Basketball Limited; Denver Nuggets Limited
Partnership; Detroit Pistons Basketball Company; Golden
State Warriors; Rocket Ball, Ltd.; Jazz Basketball
Investors, Inc.; LAC Basketball Club, Inc.; Los Angeles
Lakers, Inc.; Madison Square Garden Corporation;
Meadowlands Basketball Associates; Miami Heat Limited
Partnership; Milwaukee Bucks, Inc.; Minnesota Professional
Basketball Limited Partnership; Orlando Magic, Ltd.;
Pacers Basketball Corporation; Philadelphia 76ers
Basketball Club, Inc.; Phoenix Suns Limited Partnership,
L.P.; Sacramento Kings Limited Partnership, L.P.; San
Antonio Spurs, Ltd.; Ackerley Communications, Inc.; Trail
Blazers Inc. and Gund Business Enterprises, Inc.,
Plaintiffs-Counterclaim-Defendants-Appellees,
Chicago Professional Sports Limited Partnership,
Counterclaim-Defendant-Appellee,
v.
Charles L. WILLIAMS; Charles D. Smith; Daniel R. Manning;
Rolando A. Blackman; Mark E. Eaton; Lafayette Lever;
Herbert L. Williams; James A. Jackson; Dikembe Mutombo;
Glenn A. Rivers; David M. Robinson; Reggie Williams; Eric
Anderson; Marty Conlon; Christian Laettner; Adrian Autry
and Shawnelle Scott, on behalf of themselves and all persons
similarly situated, Defendants-Counterclaim-Plaintiffs-Appellants,
Eric Mobley and Trevor Ruffin, Defendants-Appellants,
Dominique Wilkins; Horace Grant; Brian Shaw; Dale Davis;
Terrell Brandon; Donyell Marshall and National
Basketball Players Association,
Counterclaim-Plaintiffs-Appellants.
 No. 761, Docket 94-7709.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 22, 1994.
Decided Jan. 24, 1995.
 
 Frederick A.O. Schwarz, Jr., New York City (Robert S. Rifkind, Rowan D. Wilson, Michelle K. Jacobs, Sara M. Darehshori, Cravath, Swaine & Moore, New York City; George H. Cohen, Robert M. Weinberg, Andrew D. Roth, Bredhoff & Kaiser, Washington, DC; Simon P. Gourdine, Ronald Klempner, New York City, of counsel), for appellants.
 Jeffrey A. Mishkin, New York City (Howard L. Ganz, Steven C. Krane, Wendy H. Schwartz, Douglas L. Perlman, Proskauer Rose Goetz & Mendelsohn; Frank Rothman, Shepard Goldfein, William L. Daly, Skadden Arps Slate Meagher & Flom; Richard W. Buchanan, of counsel), for appellees.
 Joel G. Chefitz (Stephen D. Libowsky, Robert K. Niewijk, Katten Muchin & Zavis, Chicago, IL; John N. Romans, Katten Muchin & Zavis, New York City, of counsel), for counterclaim-defendant-appellee Chicago Professional Sports Ltd. Partnership.
 Before: WINTER, PRATT, and CALABRESI, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Appellants, who are professional basketball players and their union, appeal Judge Duffy's dismissal of their counterclaim and grant of declaratory relief to the National Basketball Association (the "NBA") and its member teams (collectively, the "NBA Teams"). Judge Duffy held that: (i) the antitrust laws have no application to the collective bargaining negotiations between appellants and the NBA Teams; and (ii) even if the antitrust laws apply, the "College Draft," "Right of First Refusal," and "Revenue Sharing/Salary Cap System" survive scrutiny under the Rule of Reason. We affirm on the first ground.
 
 BACKGROUND
 
 2
 The NBA is comprised of 27 member teams, each of which is an appellee on this appeal. Appellants are a class of present and future players on NBA member teams, and the National Basketball Players Association, the exclusive bargaining representative of all players presently on the roster of NBA Teams (collectively the "Players").
 
 
 3
 For nearly 30 years, the NBA Teams have bargained as a multiemployer bargaining unit with the Players Association. Since October 1967, the NBA and the Players Association have entered into ten successive collective bargaining agreements ("CBAs"). The most recent CBA went into effect on November 1, 1988 (the "1988 CBA"), and expired on June 23, 1994, the day following the last playoff game of the 1993-94 NBA season. During negotiations over a new CBA in April and May 1994, the Players demanded the elimination of three provisions contained in the 1988 CBA: the "College Draft," the "Right of First Refusal," and the "Revenue Sharing/Salary Cap System."
 
 
 4
 The College Draft is the process by which exclusive rights to negotiate with eligible college players are apportioned among the NBA Teams. In general, the College Draft allows teams with the worst records to select earlier than teams with better records. The NBA Teams select 54 players in the Draft. A player who is drafted by a particular team may negotiate only with that team. A player who is not drafted may negotiate with any NBA team.
 
 
 5
 The Right of First Refusal permits a team to match any offer made to one of its current players by another team and thus to retain the player's services. The Right of First Refusal applies only to Restricted Free Agents--players who have either completed fewer than two contracts or have fewer than four years of experience in the NBA.
 
 
 6
 The Revenue Sharing/Salary Cap System establishes an overall wage framework that provides that: (i) total player salaries and benefits paid by all NBA Teams will be no less than a specified percentage of revenues; and (ii) the total salary paid to players by each team is subject to both a maximum and a required minimum. The Right of First Refusal and the present version of the College Draft have been incorporated in all the CBAs signed by the parties since 1976; the Revenue Sharing/Salary Cap provision has been included in every CBA since 1983.
 
 
 7
 On May 4, 1994, the Players refused to negotiate further with the NBA Teams until the 1988 CBA formally expired. On June 17, 1994, the NBA Teams began the instant action in the Southern District of New York, seeking a declaratory judgment against the individual appellants and a class of all present and future NBA players. The NBA Teams sought two principal declarations: (i) that the continued imposition of the disputed provisions of the CBA would not violate the antitrust laws because that imposition is "governed solely by the labor laws and is exempt from antitrust liability under the nonstatutory exemption to the antitrust laws"; and (ii) that the disputed provisions are lawful even if the antitrust laws apply. On June 27, 1994, the Players counterclaimed, asserting that continued imposition by the NBA Teams of the College Draft, Right of First Refusal, and Revenue Sharing/Salary Cap System violated the Sherman Act because they were no longer embodied in an unexpired CBA. They sought a temporary restraining order and preliminary injunction barring the NBA Teams from entering into contracts with players until the case could be decided on the merits. On June 28, 1994, Judge John F. Keenan issued the requested TRO and set a July 8 date for a preliminary injunction hearing.
 
 
 8
 On July 8, Judge Duffy, to whom the case was assigned, consolidated the preliminary injunction hearing with the trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2). The trial was conducted on July 12, 1994. The Players called nine witnesses--three players, three player agents, the Executive Director of the Players' Association, and two economists. Because Judge Duffy allotted only one day for the trial, the Players proffered their direct testimony largely through affidavits, followed by cross-examination. The NBA Teams called NBA Commissioner David J. Stern as a live witness and introduced the affidavit of Deputy Commissioner Russell T. Granik.
 
 
 9
 On July 18, Judge Duffy granted the NBA's request for declaratory relief and dismissed the Players' counterclaim. Relying on Powell v. National Football League, 930 F.2d 1293, 1304 (8th Cir.1989), cert. denied, 498 U.S. 1040, 111 S.Ct. 711, 112 L.Ed.2d 700 (1991), Judge Duffy concluded that the nonstatutory labor exemption from the antitrust laws applied, and that "[a]ntitrust immunity exists as long as a collective bargaining relationship exists." Accordingly, he held that the NBA was entitled to a declaration that the continued imposition of the College Draft, Right of First Refusal, and Revenue Sharing/Salary Cap provisions does not violate the antitrust laws so long as there is a collective bargaining relationship between the NBA and the Players' Association.
 
 
 10
 Judge Duffy further held that, even if the NBA Teams have no antitrust immunity, the Players had nevertheless failed to show that the provisions in question are "unreasonably anti-competitive." In so concluding, he relied upon the benefits of competitive athletic balance that he found are promoted by those provisions. He thus held that the disputed provisions do not violate the antitrust laws even if the nonstatutory labor exemption does not apply.
 
 
 11
 The Players appealed.
 
 DISCUSSION
 
 12
 A. The Players' Antitrust Claim and the NBA Teams' Defense
 
 
 13
 The gravamen of the Players' claim is not that the College Draft, Right of First Refusal, or Revenue Sharing/Salary Cap System result in a restraint on competition unique to those provisions (although they discuss the restrictiveness of those particular provisions with regard to the Rule of Reason issue). Rather, the vice on which their claim relies is that the NBA Teams have agreed jointly to impose these provisions as terms and conditions of employment pending agreement on a new CBA. Their "main point" is that "these are naked restraints between competitors; they prevent competition; they fix prices; they suppress salaries." Appellants' Brief at 11. At oral argument, counsel for the Players stated that the "underlying offense" is that "horizontal competitors for labor have entered into what is essentially a price-fixing agreement." Although the Players concede that employers may act jointly with regard to terms of employment where a particular union agrees to those terms, see Wood v. National Basketball Ass'n, 809 F.2d 954 (2d Cir.1987), they dispute the legality of any joint conduct going beyond proposals to that union. Logically, the Players' position is that multiemployer groups should be barred from insisting upon, or using economic force to obtain, the desired terms of employment. Therefore, by acting collectively to impose terms of employment after expiration of the CBA, the NBA Teams are, in the Players' view, acting as a cartel and committing a per se violation of the Sherman Act. See Appellants' Brief at 39 (characterizing the disputed provisions as "naked agreements among competitors designed ... to fix ... labor costs"). They might add, moreover, that the cartel's decision is enforced by a joint boycott--that is, a failure by a Team to abide by the cartel's rules would result in sanctions imposed by the NBA, including perhaps expulsion from the league--another per se violation.
 
 
 14
 The claim is fashioned to rely upon classic principles of antitrust law. Absent justification under the Rule of Reason or some defense, employers who compete for labor may not agree among themselves to purchase that labor only on certain specified terms and conditions, see Anderson v. Shipowners' Ass'n, 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298 (1926), and such a cartel may not enforce its will through an agreement to boycott those who do not abide by its rules, see Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). Such conduct would be per se illegal.
 
 
 15
 The Players' claim does limit the application of normal antitrust principles in recognition that some accommodation must be made to labor law. For example, if the NBA Teams are a naked price (wage)-fixing cartel as the per se claim asserts, there would be no reason to allow them even to discuss prices (wages). See Arizona v. Maricopa County Medical Soc'y, 457 U.S. 332, 362, 102 S.Ct. 2466, 2482, 73 L.Ed.2d 48 (1982) ("a per se price-fixing agreement meriting condemnation ... is a naked restraint of trade with no purpose except stifling of competition"). At oral argument, appellants took the position that the NBA Teams may consult over and "suggest," but not "impose," terms and conditions of employment pending a new CBA. In their view, consultation and proposal are protected by the so-called nonstatutory antitrust exemption, whereas the imposition of terms, or, logically, insistence upon them, is subject to antitrust sanctions. However, because the NBA Teams are simply maintaining the status quo under the expired 1988 CBA, the question arises as to what terms and conditions of employment should govern the parties' relationship until a new CBA is reached if maintenance of the status quo is an antitrust violation. For lack of any discernible alternative, we conclude that the Players' answer must be that the Players' Association will impose those terms and conditions.
 
 
 16
 The NBA's defense is a two-fold, alternative response: (i) the Players' antitrust claim is entirely trumped by the legislative scheme governing labor relations and collective bargaining, see Powell v. National Football League, 930 F.2d 1293 (8th Cir.1989), cert. denied, 498 U.S. 1040, 111 S.Ct. 711, 112 L.Ed.2d 700 (1991), in particular by the protection afforded multiemployer bargaining by that scheme, see NLRB v. Truck Drivers Local Union No. 449 ("Buffalo Linen"), 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957); and (ii) even if the antitrust laws do apply, the College Draft, Right of First Refusal, and Revenue Sharing/Salary Cap provisions survive scrutiny under the Rule of Reason because the efficiencies these provisions afford in the way of competitive athletic balance among NBA teams outweigh their effect on competition for the services of the Players, see NCAA v. Board of Regents, 468 U.S. 85, 117, 119-20, 104 S.Ct. 2948, 2968, 2969-70, 82 L.Ed.2d 70 (1984).
 
 
 17
 We conclude as follows. Relevant legal authority, including importantly the lack thereof, strongly suggests that the antitrust laws do not prohibit employers from acting jointly in bargaining with a common union. Multiemployer bargaining was commonplace and essentially unchallenged--despite the existence of the antitrust laws--long before the passage of the federal labor laws. The labor laws, moreover, embody a conscious congressional decision to permit multiemployer organizations to bargain hard and use economic force to resolve disputes with unions over terms and conditions of employment. Because the Players' position appears to be inconsistent with the approach taken under the antitrust laws regardless of labor law and, in any event, collides head-on with the labor laws' endorsement of multiemployer collective bargaining, we conclude that the Players' claim must fail. We need not, therefore, address the various arguments pro and con regarding the Rule of Reason.
 
 
 18
 B. The Nature and Purposes of Multiemployer Bargaining
 
 
 19
 Multiemployer bargaining is a very common practice throughout the United States and literally involves millions of employees and thousands of employers. See Charles D. Bonanno Linen Serv., Inc. v. NLRB, 454 U.S. 404, 410 n. 4, 102 S.Ct. 720, 724 n. 4, 70 L.Ed.2d 656 (1982). The practice is probably as old as unionism itself. See Clarence E. Bennett, Employers' Associations in the United States: A Study of Typical Associations 21 (1921) (employer associations can be traced to middle-ages). It is a process by which employers band together to act as a single entity in bargaining with a common union or unions. Typically, the employers are competitors in the products and services they provide to buyers. Quite often, they are also horizontal competitors for labor. For example, local printing firms that compete with each other to obtain printing jobs and to obtain labor may bargain jointly with a union of printers.
 
 
 20
 One important purpose of such bargaining is to strengthen the employers' hand by preventing a union from whipsawing employers by shutting them down one-by-one, a tactic that forces each employer to give in to the union's most extreme demand. See Bonanno Linen, 454 U.S. at 409-10 & n. 3, 102 S.Ct. at 723-24 & n. 3. Multiemployer bargaining thus allows employers to form a common front as to terms and conditions to be offered to a union and to confront the union with a simultaneous shutdown of all the employers should negotiations fail and the parties resort to economic force. Such bargaining also eliminates competitive disadvantages resulting from differing CBA terms for different employers. Id. at 409 n. 3, 102 S.Ct. at 723 n. 3. Finally, it makes available group benefit programs that may be unavailable to individual employers and reduces negotiating costs by eliminating multiple negotiations. Id.
 
 
 21
 In the sports industry, multiemployer bargaining exists not only for the reasons stated above but also because some terms and conditions of employment must be the same for all teams in a sports league. Unlike the industrial context in which many work rules can differ from employer to employer--even though a roughly common bottom line is desirable--sports leagues need many common rules. Number of games, length of season, playoff structures, and roster size and composition, for example, are just a few of the many kinds of league rules that are typically bargained over by sports leagues and unions of players.
 
 
 22
 Appellants' claim is that employers may not agree upon common terms and conditions of employment to be negotiated in a new CBA, bargain hard over those terms, ultimately insist upon them, and even obtain them by resorting to economic force. Appellants thus claim that the most routine practices of multiemployer bargaining, if not its very raison d'etre, are per se unlawful. It is the essence of multiemployer bargaining that employers jointly establish and maintain a unified front in dealing with a common union. That goal requires that employers be allowed to meet and agree upon the terms and conditions of employment to be pursued as a unit and to act as though they were a single employer. The Players' claim is thus based on the proposition that the major purposes of, and the means employed by, multiemployer organizations are illegal.
 
 
 23
 C. The Antitrust Laws and Multiemployer Bargaining
 
 
 24
 The existence of employer organizations that bargained with unions of employees pre-dated the passage of the Sherman Act in 1890. See Bennett, supra, at 21-22. Indeed, at that time these organizations existed at the national as well as local level. Id. Nevertheless, we find during the 104 succeeding years not a single instance, prior to this very case, of a union or an individual employee asserting the stark claim that the routine practices of multiemployer bargaining violate the antitrust laws. It is true that recent antitrust challenges in the professional sports industry have at times involved facts very similar to those in the instant matter, see Powell, 930 F.2d 1293; Brown v. Pro Football, Inc., 782 F.Supp. 125 (D.D.C.1991); Bridgeman v. National Basketball Ass'n, 675 F.Supp. 960 (D.N.J.1987), but the multiemployer bargaining issue appears to have been raised obliquely, if at all.
 
 
 25
 To the extent Congress has focused on the legality of multiemployer collective bargaining, it has always indicated its approval, or at least an assumption of legality. In 1920, Congress sought in the Clayton Act to prevent federal courts from interfering in labor disputes. Although Congress was largely concerned with the effect of such interference on unions, the statute was phrased in an evenhanded fashion to protect employer conduct in labor disputes as well as that of unions. Section 20 thus exempted from federal prohibition "persons ... terminating any relation of employment ... or withholding ... moneys or things of value," language that would permit multiemployer lockouts. 29 U.S.C. Sec. 52. In 1932, Congress passed the Norris-LaGuardia Act, which barred federal courts from issuing injunctions against firms seeking to join, or remain members of, employer organizations, 29 U.S.C. Sec. 104(b), and used language similar to that of the Clayton Act quoted supra, 29 U.S.C. Sec. 104(c). The definition of persons involved in a labor dispute also recognizes the existence of employer organizations. See 29 U.S.C. Sec. 113(b). See also California State Council of Carpenters v. Associated Gen. Contractors, 648 F.2d 527, 535 (9th Cir.1981) ("[E]ven if the antitrust laws had been interpreted so as to bring multiemployer bargaining units within the scope of the Sherman Act, the statutory exemption found in section 4 of the Norris-LaGuardia Act, 29 U.S.C. Sec. 104, when read together with section 20 of the Clayton Act, 29 U.S.C. Sec. 52, clearly exempts '[b]ecoming or remaining a member ... of any employer organization' from the antitrust laws. 29 U.S.C. Sec. 104(b)." (footnote omitted)). In 1947, Congress refused to limit multiemployer bargaining because it concluded that such bargaining "was a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining." Buffalo Linen, 353 U.S. at 95, 77 S.Ct. at 647 (discussing congressional debate over the Taft-Hartley amendments of 1947).
 
 
 26
 The lack of any antitrust challenge to, or congressional action restricting, multiemployer bargaining, for a century during which it prominently existed, grew, and flourished, strongly suggests some kind of general understanding about the legality of multiemployer bargaining that is fundamentally inconsistent with appellants' claim.
 
 
 27
 The lack of any legal or congressional challenge was certainly not the result of any obscurity regarding the antitrust principles relied upon by the Players. In 1897, the Supreme Court held that an agreement upon prices among competitors violated the Sherman Act. United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 335, 17 S.Ct. 540, 556-57, 41 L.Ed. 1007 (1897). In 1914, it held joint boycotts illegal. Eastern States, 234 U.S. 600, 34 S.Ct. 951. In 1926, it held that employers who were horizontal competitors for labor were prohibited from agreeing upon terms and conditions of employment. Anderson, 272 U.S. 359, 47 S.Ct. 125. The principles upon which the Players rely, therefore, were well-known and settled early on. Nor was the lack of any such challenge the result of the obscurity of the antitrust laws. Throughout the period from the passage of the Sherman Act until 1941, see United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941) (exempting union activity from challenges under the Sherman Act), unions and employers were frequently locked in nationally controversial antitrust litigation. See Robert A. Gorman, Basic Text on Labor Law, Unionization and Collective Bargaining 621-24 (1976). (It might be suggested that unions failed to mount the precise claim at issue here because multiemployer bargaining is voluntary under the labor laws. Bonanno Linen, 454 U.S. at 412, 102 S.Ct. at 725; Council of Carpenters, 648 F.2d at 543-54. However, that fails to explain the lack of any such challenge by a union prior to passage of the Wagner Act in 1935 or by an individual employee thereafter.)
 
 
 28
 Indeed, the only case that directly addresses the issue of the legality of multiemployer bargaining under the antitrust laws appears to be California State Council of Carpenters v. Associated General Contractors, 648 F.2d at 543-54. The decision in question was on a petition for rehearing by the defendant employers who claimed that a prior opinion in the matter suggested that multiemployer bargaining violated the antitrust laws. It is noteworthy that no such claim had been asserted by the plaintiff union. The opinion on rehearing disclaimed any such intent and directly held that "although multiemployer bargaining units may affect or restrain competition in the area of wages and working conditions, such restraints will not be considered to violate the antitrust laws." 648 F.2d at 544.
 
 
 29
 We believe that the history recounted here strongly suggests that Congress never intended that the antitrust laws prohibit multiemployer bargaining with a common union. Congress seemed to assume, and then to act on that assumption in 1947, see Buffalo Linen, 353 U.S. at 95-96, 77 S.Ct. at 647-48, that multiemployer bargaining was both efficient and a necessary counterweight to union power. Such a belief arguably fits within Rule of Reason analysis that permits "ancillary restraints" necessary to a legitimate transaction. See United States v. Addyston Pipe & Steel Co., 85 F. 271, 282 (6th Cir.1898), modified, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899). Whether as a court we would reach that result if writing on a clean slate is not the issue, however, because whatever doubt might have existed as to Congress' intent was entirely eliminated by the passage of federal labor laws.
 
 D. Labor Law and Multiemployer Bargaining
 
 30
 In Wood v. National Basketball Association, 809 F.2d 954 (2d Cir.1987), we noted that "no one seriously contends that the antitrust laws may be used to subvert fundamental principles of our federal labor policy." Id. at 959. The present case appears to have proven us wrong because just such a contention is being seriously made.
 
 
 31
 As noted, multiemployer bargaining has been a conspicuous feature of collective bargaining since the very formation of unions. To hold at this late date that it--or the essence of practice under it--is illegal under the antitrust laws would cause a massive reshaping of the institution of collective bargaining.
 
 
 32
 Under the National Labor Relations Act, employers and unions must bargain in good faith over mandatory subjects of bargaining. 29 U.S.C. Sec. 158(d). Our decision in Wood held that the College Draft, Right of First Refusal, and Revenue Sharing/Salary Cap System are mandatory subjects of bargaining. Wood, 809 F.2d at 962. It is settled law that employers may formulate proposals to unions and insist upon the proposals so long as they bargain in good faith. Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 210, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964). It is also settled law that employers may implement terms and conditions of employment after good-faith bargaining to an impasse and also resort to economic force, including lock-outs, in support of their demands. First Nat'l Maintenance Corp. v. NLRB, 452 U.S. 666, 675, 101 S.Ct. 2573, 2579, 69 L.Ed.2d 318 (1981) ("[B]oth employer and union may bargain to impasse over [terms and conditions of employment] and use the economic weapons at their disposal to attempt to secure their respective aims."); see also American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965) (upholding employer's right to lock out employees). In appellants' view, however, they need not really bargain over mandatory subjects of bargaining because the employers' conduct described above, when engaged in by a multiemployer organization, constitutes illegal price-fixing.
 
 
 33
 Turning to the precise facts of the present case, the claim that the NBA Teams may not continue to impose the challenged provisions places the Teams in an impossible position. Those provisions were, of course, part of the 1988 CBA, and, under the Teams' obligation to bargain in good faith, they were obligated to maintain the status quo until an impasse was reached. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). However, appellants claim that imposition of those provisions violated the antitrust laws as soon as the CBA expired, a position that views as illegal, conduct required by the NLRA. Even after impasse, moreover, if employers may impose new terms and conditions of employment, they are surely free to maintain the status quo.
 
 
 34
 The only basis for the claim asserted by appellants is that multiemployer bargaining is illegal. For us, therefore, the decisive fact is that the Supreme Court has upheld multiemployer bargaining on the ground that Congress expressly considered its propriety and resolved that it should be allowed. Buffalo Linen, 353 U.S. at 95-96, 77 S.Ct. at 647-48. Buffalo Linen involved a multiemployer association of eight employers who were horizontal competitors in hiring labor and in providing linen services. In the course of negotiating a new agreement with the association, the union struck one of the employers. In response, the other seven employers locked out their employees. The Labor Board held that the lockout was justified as a reasonable measure to preserve multiemployer bargaining against the threat of being forced into submission one-by-one. The Court of Appeals overturned the Board, holding that preservation of the integrity of multiemployer bargaining did not justify a lockout. The Supreme Court unanimously reversed, holding that Congress expressly intended that multiemployer bargaining be allowed and that the Board had discretion to hold as it did.
 
 
 35
 In speaking for the unanimous Court, Justice Brennan wrote:
 
 
 36
 Multiemployer bargaining long antedated the Wagner Act, both in industries like the garment industry, characterized by numerous employers of small work forces, and in industries like longshoring and building construction, where workers change employers from day to day or week to week. This basis of bargaining has had its greatest expansion since enactment of the Wagner Act because employers have sought through group bargaining to match increased union strength. Approximately four million employees are now governed by collective bargaining agreements signed by unions with thousands of employer associations. At the time of the debates on the Taft-Hartley amendments, proposals were made to limit or outlaw multi-employer bargaining. These proposals failed of enactment. They were met with a storm of protest that their adoption would tend to weaken and not strengthen the process of collective bargaining and would conflict with the national labor policy of promoting industrial peace through effective collective bargaining.
 
 
 37
 The debates over the proposals demonstrate that Congress refused to interfere with such bargaining because there was cogent evidence that in many industries the multi-employer bargaining basis was a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining. The inaction of Congress with respect to multi-employer bargaining cannot be said to indicate an intention to leave the resolution of this problem to future legislation. Rather, the compelling conclusion is that Congress intended "that the Board should continue its established administrative practice of certifying multi-employer units, and intended to leave to the Board's specialized judgment the inevitable questions concerning multi-employer bargaining bound to arise in the future." [Truck Drivers Local Union No. 449 v. NLRB, 231 F.2d 110, 117-18 (2d Cir.1956).]
 
 
 38
 Although the Act protects the right of the employees to strike in support of their demands, this protection is not so absolute as to deny self-help by employers when legitimate interests of employees and employers collide. Conflict may arise, for example, between the right to strike and the interest of small employers in preserving multi-employer bargaining as a means of bargaining on an equal basis with a large union and avoiding the competitive disadvantages resulting from nonuniform contractual terms. The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.
 
 
 39
 353 U.S. at 94-96, 77 S.Ct. at 646-48 (footnotes omitted).
 
 
 40
 Buffalo Linen simply cannot be reconciled with appellants' antitrust claim. The facts in that case plainly involved conduct that, if antitrust principles apply, were price-fixing and a joint boycott, per se violations of the Sherman Act. However, the decision not only permitted the conduct but also stated that Congress had expressly considered multiemployer bargaining and had resolved to allow it subject only to the limitations of labor law as interpreted by the Labor Board. At oral argument, the Players sought to distinguish Buffalo Linen on the ground that it deals solely with issues relating to the use of economic force. That reading of the decision is simply unsupportable. Indeed, the suggested distinction between employers proposing terms and conditions of employment and employers' resorting to economic force to back up the proposals is at war with appellants' antitrust claim. A cartel that proposes common terms hardly ceases to be a cartel when it resorts to economic force to enforce those terms. If anything, the resort to economic force enhances rather than diminishes the effect on competition.
 
 
 41
 Finally, the Players correctly note that multiemployer bargaining is generally a voluntary matter and that employers or unions are free to withdraw from it. See Bonanno Linen, 454 U.S. at 412, 102 S.Ct. at 725. Even so, the consequences of this voluntariness for the parties before us is left to proceedings under the NLRA before the Labor Board. This is particularly the case because the Board and one court of appeals have held that sports leagues are an exception to the principle of voluntariness. See North American Soccer League v. NLRB, 613 F.2d 1379 (5th Cir.) (requiring teams in a soccer league to bargain as a "joint employer"), cert. denied, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 128 (1980).
 
 
 42
 We thus agree with the decision in Powell, 930 F.2d 1293, in which the Eighth Circuit held that the nonstatutory labor exemption precluded an antitrust challenge to various terms and conditions of employment implemented after impasse by National Football League teams. The Court noted the soup-to-nuts array of rules and remedies afforded under the labor laws and concluded that application of antitrust principles to a collective bargaining relationship would disrupt collective bargaining as we know it.
 
 
 43
 We agree. The claim before us, if adopted, would prevent employers in all industries from jointly bargaining hard with a common union. Although the Players' claim as presently formulated would allow employers jointly to make proposals, they could not maintain the status quo after expiration of the agreement and before bargaining to an impasse, nor could they implement new terms after impasse without fear of antitrust sanctions. The claim, of course, cannot be limited to sports leagues because it relies upon general antitrust principles. Under the interpretation of these principles urged by appellants, if, after expiration of a CBA, a group of printers were to agree to seek to limit wage increases to 5% and the union demanded 10%, the employers could shield themselves from antitrust liability only by implementing the 10% raise. The agreement among the printers is, after all, a "naked restraint[ ] between competitors; [it] prevent[s] competition; [it] fix[es] prices; [it] suppress[es] salaries." Appellants' Brief at 11. This is not collective bargaining as intended by Congress. Indeed, it is not bargaining at all.
 
 CONCLUSION
 
 44
 We therefore hold that the antitrust laws do not prohibit employers from bargaining jointly with a union, from implementing their joint proposals in the absence of a CBA, or from using economic force to obtain agreement to those proposals. What limits on such conduct that exist are found in the labor laws. We add only that this in our view is not necessarily a case in which two wholly inconsistent statutory schemes can be reconciled only by a judicial holding that one trumps the other. As our discussion of the antitrust laws indicated, there appears to have been a longstanding if unspoken assumption that multiemployer collective bargaining was not subject to the antitrust laws for largely the reasons later stated in Buffalo Linen and Bonanno Linen. We hold only that what doubts may have existed about that assumption were erased by the passage of federal labor laws.
 
 
 45
 Affirmed.