**Joe L. CALDWELL, Plaintiff–Appellant,**

v.

**The AMERICAN BASKETBALL ASSOCIATION, INC.; The Spirits of St. Louis Basketball Club, a limited partnership; Ozzie Silna; Daniel Silna; Harry Weltman; Donald Schupak; and Tedd Munchak, Defendants–Appellees.**

**No. 744, Docket 94–7147.**

United States Court of Appeals, Second Circuit.

Argued Jan. 30, 1995.

Decided Sept. 21, 1995.

---

Philip J. Shea, Phoenix, AZ (Shea & Wilks, Phoenix, AZ, of counsel), for plaintiff-appellant.

Jack David, New York City (Steven Finell, David C. Berg, Siller, Wilk & Mencher, New York City, of counsel), for defendants-appellees The Spirits of St. Louis Basketball Club, Daniel Silna and Donald Schupak.

Herbert Teitelbaum, New York City (Teitelbaum, Hiller, Rodman, Paden & Hibsher, P.C., of counsel), for defendant-appellee Tedd Munchak.

Before MESKILL, WINTER and McLAUGHLIN, Circuit Judges.

WINTER, Circuit Judge:

Joe L. Caldwell appeals from Judge Sand's grant of summary judgment, *Caldwell v. American Basketball Ass'n,* 825 F.Supp. 558 (S.D.N.Y.1993), dismissing his complaint. The complaint alleged that the various appellees violated the Sherman Act, 15 U.S.C. § 1 *et seq.,* by conspiring to prevent him from playing professional basketball and by attempting to monopolize the market for professional basketball services. It further alleged that appellees The Spirits of St. Louis Basketball Club, Donald Shupak, and Daniel Silna committed intentional or prima facie torts under New York law. Because Caldwell's antitrust claims are barred by the nonstatutory labor exemption and his state law claims are preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.,* we affirm.

## BACKGROUND

In 1970, Caldwell signed a five-year contract to play basketball for the Carolina Cougars, a member team of the appellee American Basketball Association ("ABA"). In the same year, pursuant to the NLRA, the ABA Players' Association (the "Union") became the exclusive collective bargaining representative for all ABA players. Caldwell served as vice-president and later president of the Union and as the Union's player representative for the Cougars. *Caldwell,* 825 F.Supp. at 560–61.

During Caldwell's first four seasons with the Cougars, he performed ably and was elected to the All–Star team during two of the four years. He also became team captain of the Cougars. After Caldwell's fourth season, the owner of the Cougars, appellee Tedd Munchak, sold the team and became commissioner of the ABA. A group headed by appellees Ozzie and David Silna became the new owners of the Cougars. The Cougars subsequently moved to St. Louis and were renamed "The Spirits of St. Louis." *Id.* at 561–62.

On November 20, 1974, Marvin Barnes, a star player for the Spirits, failed to appear

for an important game. Barnes's dissatisfaction with his contract with the Spirits had prompted him to "jump" the team as a negotiating tactic. When the Spirits' coach asked Caldwell where Barnes was, Caldwell denied having any knowledge of Barnes's whereabouts. Although Barnes returned to the team soon thereafter, the Spirits (as assignee from the Cougars) suspended Caldwell pursuant to certain terms in his individual contract, because they believed that he had been involved in planning the incident. *Id.* at 562.

Caldwell appealed his suspension, with the aid of the Union, to the ABA commissioner. However, Caldwell decided not to pursue internal remedies in the ABA but rather to litigate the suspension. Accordingly, in February 1975 Caldwell brought a contract action in a federal district court in Georgia against Munchak, who was a guarantor of his individual contract. After a bench trial, Caldwell recovered his full 1974–75 salary of $220,000, plus interest, costs and expenses. *Id.* at 563.

Caldwell never played professional basketball again. His contract with the Spirits would have expired, or did expire, on October 29, 1975, but Caldwell alleges that he "was never told that his suspension was lifted, or that the Spirits had terminated his contract, or that other teams were free to negotiate with him." *Id.* at 562. After merger negotiations with the NBA succeeded, the ABA and the Spirits ceased operations after the 1975–76 season. *Id.* at 564.

Caldwell filed the instant lawsuit in early 1975. It was placed on the district court's suspense calendar pending resolution of the Georgia action but was not reactivated for eighteen years due to Caldwell's bankruptcy proceedings. *Id.* at 563. Caldwell alleged in his complaint that the defendants: (i) "combined and conspired to blacklist him and deprive him of the opportunity to continue his career as a professional basketball player" in violation of Section 1 of the Sherman Act; (ii) conspired and attempted to monopolize the market for professional basketball services in violation of Section 2 of the Sherman Act; and (iii) acted tortiously and maliciously when they suspended Caldwell "indefinitely." *Id.* at 564, 574, 576.

Caldwell asserted that appellees and the National Basketball Association ("NBA") desired to keep him out of professional basketball during the 1974–76 period in order to exclude him from the ABA–NBA merger negotiations that were then taking place. Caldwell claimed that he had achieved "notoriety" a year earlier when, as acting president of the Union, he had refused to approve the terms of a collective bargaining agreement.

Appellees offered evidence that Caldwell's physical limitations accounted for his inability to secure employment as a professional basketball player after 1975. In that regard, the record shows that: (i) Caldwell was 33 years old at the time of his suspension and less than two percent of NBA players during the five basketball seasons between 1976 and 1981 were 34 years old or older; (ii) Caldwell had sustained a torn ligament during the 1971 season; and (iii) Caldwell had sustained an additional injury in an automobile accident in January, 1975. *Id.* at 564. Moreover, all but four of the ABA's teams ceased operations after the merger, resulting in a decreased demand for basketball players.

The district court granted summary judgment in favor of appellees on the ground that Caldwell's physical limitations were the sole cause of his failure to secure another position as a professional basketball player. *Caldwell*, 825 F.Supp. at 570. We affirm, but on different grounds.

## DISCUSSION

■ We review the district court's grant of summary judgment *de novo*, *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993), and view the evidence in the light most favorable to Caldwell. *See Prunier v. City of Watertown*, 936 F.2d 677, 679 (2d Cir.1991).

### A. State Law Claims

We take the unusual step of addressing Caldwell's state law claims first because our resolution of those claims sheds light upon the disposition of his federal antitrust claims.

■ Caldwell asserts that the refusal of ABA teams to hire him was the result of a

stance he had earlier taken as Union president in opposing a new collective bargaining agreement and because of appellees' resultant desire to exclude him from any role in the ABA–NBA merger negotiations. The essence of his factual claim thus is that the ABA refused him employment because he had engaged in union activities that are protected by Section 7 of the National Labor Relations Act. If true, these facts would constitute an unfair labor practice under NLRA §§ 8(a)(1) and (3). 29 U.S.C. § 158(a)(1), (3).

■ States are preempted from regulating conduct that even "arguably" constitutes an unfair labor practice under NLRA § 8. *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 244–45, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). In *Amalgamated Ass'n of Street, Elec. Ry. and Motor Coach Employees of Am. v. Lockridge,* 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), the Supreme Court applied the *Garmon* preemption doctrine in the context of a state judgment based on a breach of contract theory and on facts that arguably constituted a violation of NLRA §§ 8(b)(2) and (a)(1), (3). *Id.* at 293, 91 S.Ct. at 1921. It noted that concurrent state court and federal administrative jurisdiction over such conduct bristled with potential conflicts between rules of substantive law, methods of administering that law, and remedies for its violation. *Id.* at 287–88, 91 S.Ct. at 1918. Both the comprehensiveness of the NLRA and the assignment of jurisdiction to a specialized federal agency, the National Labor Relations Board ("NLRB"), led the court to hold that the NLRB has exclusive jurisdiction to adjudicate conduct that arguably violates Section 8.

Caldwell's state law claims must thus be dismissed. The conduct that he alleges is at least arguably an unfair labor practice and is subject to the exclusive jurisdiction of the National Labor Relations Board. Were his state law claims allowed to proceed, a federal court would have to find facts, determine whether the state law relied upon is consistent with the substantive provisions of the NLRA, and fashion a remedy to redress a violation. However, each of these tasks is the exclusive responsibility of the NLRB.

## B. *Antitrust Claims*

### 1. *Introduction*

Although the *Garmon* doctrine of exclusive jurisdiction appears not to have been used as a defense in antitrust actions brought by unions or by players who are represented by a union, it is nevertheless relevant by analogy to our discussion of the so-called nonstatutory labor exemption, which bars Caldwell's antitrust claims.

Invoking antitrust principles that prohibit price (wage) fixing, see *Anderson v. Shipowners Assoc.,* 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298 (1926), and joint boycotts, see *Eastern States Retail Lumber Dealers' Ass'n v. United States,* 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914), Caldwell alleges that appellees agreed to blacklist him and thereby prevented him from continuing to play professional basketball. He bases his antitrust claim on two interrelated propositions: first, he asserts a right to seek the best terms for his labor as a professional basketball player; second, he asserts a right not to have teams that might compete for his skills agree collusively upon the terms upon which he will or will not be hired.

■ In *National Basketball Association v. Williams,* 45 F.3d 684 (2d Cir.1995), we stated that employers who are horizontal competitors for labor are barred by antitrust laws from acting collusively in setting terms and conditions of employment "[a]bsent justification under the Rule of Reason or some defense." *Id.* at 687. We will assume for purposes of analysis that absent a collective bargaining relationship, the conduct alleged by Caldwell would state a claim under the Sherman Act. Nevertheless, because Caldwell's antitrust claims would "subvert fundamental principles of federal labor policy," *Wood v. National Basketball Ass'n,* 809 F.2d 954, 959 (2d Cir.1987), they are barred by the so-called non-statutory exemption.

### 2. *Applicable Principles*

"[T]he inception of a collective bargaining relationship between employees and employers irrevocably alters the governing legal regime." *Brown v. Pro Football, Inc.,* 50

F.3d 1041, 1054 (D.C.Cir.1995). It does so in two ways pertinent to Caldwell's claims. First, the employee loses the right to bargain for the best price for his or her labor. Subject, of course, to federal statutes specifically overriding the NLRA, such as the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, or the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the terms of the individual's employment are left exclusively to the union and the employer to determine through processes and rules mandated by the NLRA. Second, employers are allowed to act jointly when they have a collective bargaining relationship with a common union. This joint conduct is nothing more than the quite familiar institution of multiemployer bargaining. We now examine these principles in some detail.

■■■ Under Section 8(a)(5) of the NLRA, employers are obligated to bargain collectively with a union selected by a majority of employees in an appropriate unit. 29 U.S.C. § 158(a)(5). Once a union has been selected as a collective bargaining representative, the NLRA "extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interest of all employees." *NLRB v. Allis–Chalmers Mfg. Co.,* 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967); *see also NLRB v. Insurance Agents' Int'l Union,* 361 U.S. 477, 484, 80 S.Ct. 419, 424, 4 L.Ed.2d 454 (1960) (the duty to bargain takes effect when the employees have selected their representative). "Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents." *Id.* (quotation and citation omitted); *see also J.I. Case Co. v. NLRB,* 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944) (private contracts invalid when in conflict with collective bargaining agreement or NLRA's procedures). "[O]nly the union may contract the employee's terms and conditions of employment." *Allis–Chalmers,* 388 U.S. at 180, 87 S.Ct. at 2006.

Indeed, it is an unfair labor practice for an employer to seek to bargain with individual employees absent the union's consent. *See Medo Photo Supply Corp. v. NLRB,* 321 U.S. 678, 683, 64 S.Ct. 830, 832, 88 L.Ed. 1007 (1944).

■■■ To be sure, in sports leagues, unionized players generally engage in individual bargaining with teams. However, it must be emphasized that such individual bargaining is not an exercise of a right to free competition under the antitrust laws; rather, it is an exercise of a right derived from collective bargaining itself. As we noted in *Wood,* 809 F.2d at 959, "[o]nce an exclusive representative has been selected, the individual employee is forbidden by federal law from negotiating directly with the employer absent the representative's consent, even though that employee may actually receive less compensation under the collective bargain than he or she would through individual negotiations." (citing *Allis–Chalmers,* 388 U.S. at 180, 87 S.Ct. at 2006 & *J.I. Case,* 321 U.S. at 338–39, 64 S.Ct. at 580–81).

■■■ The extinguishing of the employee's right to seek the best bargain begins once a mandatory collective bargaining relationship is established and continues throughout the relationship. *See Williams,* 45 F.3d at 692–93 (non-statutory labor exemption precludes antitrust challenge to terms and conditions of employment implemented after CBA expired and parties reached impasse). *Accord, Brown v. Pro Football, Inc.,* 50 F.3d 1041, 1056 (D.C.Cir.1995) (same). In *Brown,* the National Football League ("NFL") unilaterally imposed a fixed salary on a category of players after a collective bargaining agreement had expired and the NFL and NFL Players Association had bargained to an impasse. The Players Association asserted that the NFL had violated the Sherman Act and that the nonstatutory labor exemption "applies only where a union has manifested its consent to a restraint on trade by signing a collective bargaining agreement." *Id.* at 1049. The court rejected this argument,[1]

---

**1.** The district court in the instant case held that the nonstatutory labor exemption did not apply to appellees because the dispute did not impli-

cate a then-existing collective bargaining agreement. Noting that Caldwell's suspension "was not predicated on the suspension provisions of

holding that the NFL's actions were part of the collective bargaining process and therefore within the nonstatutory exemption. *Id.* at 1053–54 ("employer's unilateral implementation after impasse of a term encompassed within its pre-impasse proposals" is a "unilateral but lawful aspect[ ] of the collective bargaining process established by the NLRA"). Although the collective bargaining agreement had expired, the court concluded that "[t]he NLRA makes clear that federal labor policy focuses on collective bargaining as a process, rather than collective bargaining agreements alone." *Id.* at 1051. We agree.

■ Once an exclusive bargaining representative has been selected, the NLRA provides unions, employers, and employees with a "soup-to-nuts array" of rules, tribunals and remedies to govern that process. *Williams,* 45 F.3d at 693; *see generally,* ROBERT A. GORMAN, BASIC TEXT ON LABOR LAW, UNIONIZATION AND COLLECTIVE BARGAINING (1976). For example, the parties must bargain in good faith over mandatory subjects of bargaining. 29 U.S.C. §§ 158(a)(5), 158(b)(3); *NLRB v. Wooster Div. of Borg–Warner Corp.,* 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958); *see generally,* GORMAN, *supra* at 496–502. Caselaw requires the provision of information during bargaining, *NLRB v. Truitt Mfg. Co.,* 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); *see generally,* GORMAN, *supra* at 409–18, and otherwise regulates the bargaining process during and between collective agreements. *See* GORMAN, *supra* at 399–400. Certain other practices by unions and employers are designated as illegal unfair labor practices. 29 U.S.C. § 158. As a specialized tribunal, the NLRB is established to enforce these and other obligations. *See generally* GORMAN, *supra* at 7–18. Section 301 of the Labor Management Relations Act provides that collective agreements may be enforced in federal courts. 29 U.S.C. § 185(a). Finally, unions are obligated to bargain fairly on behalf of employees in the bargaining unit, *Vaca v. Sipes,* 386 U.S.

171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967), an obligation enforceable in federal courts. *National Labor Relations Board v. Local 282, Int'l Bhd. of Teamsters,* 740 F.2d 141, 146 (2d Cir.1984).

■ Thus, a mandatory subject of bargaining pertinent in the instant matter is the circumstances under which an employer may discharge or refuse to hire an employee. An employer's refusal to bargain in good faith over a proposed restriction on the right to hire and fire is an unfair labor practice that the NLRB is empowered to adjudicate and to remedy. 29 U.S.C. §§ 158(a)(5), (b)(3), (d). A discharge of an employee for engaging in union activity is another unfair labor practice enforceable by the NLRB. 29 U.S.C. § 158(a)(3). Once an agreement is reached, a discharged employee may seek to enforce restrictions on discharges through the union, *Vaca,* 386 U.S. at 183–85, 87 S.Ct. at 913–14, or individually in the federal courts under NLRA § 301. 29 U.S.C. § 185; *Vaca,* 386 U.S. at 184–85, 87 S.Ct. at 913–14. If the union acts arbitrarily in not enforcing an agreement or in allowing an employee to be discharged, the employee may bring an action against it in federal court under the duty of fair representation. *Local 282, Int'l Bhd. of Teamsters,* 740 F.2d at 146.

■ We turn now to the question of whether an employee's antitrust claim is somehow bolstered by an allegation that employers acted jointly in refusing employment. It is not. As we held in *Williams,* 45 F.3d at 688, and as reaffirmed in *Brown,* 50 F.3d at 1056, multiemployer bargaining groups do not violate the antitrust laws although they plainly involve horizontal competitors for labor acting in concert to set and to implement terms of employment. Multiemployer bargaining existed prior to the Sherman Act, *Williams,* 45 F.3d at 691, and its legality was expressly considered by Congress when it passed the Taft–Hartley Act. *See NLRB v. Truck Drivers Local Union No. 449* ("Buffa-

the Collective Bargaining Agreement [first entered in 1972] or the Association by-laws," the district court stated that "this controversy may be entirely resolved without any reference whatsoever to the Collective Bargaining Agreement." *National Basketball Ass'n v. Williams,* 45 F.3d 684 (2d Cir.1995), has since applied the nonstatutory exemption in circumstances in which no

collective bargaining agreement existed, as did *Brown v. Pro Football Inc.,* 50 F.3d 1041, 1052–54 (D.C.Cir.1995), which held that the nonstatutory exemption applies whenever there is a collective bargaining relationship regardless of whether a collective bargaining agreement is in force.

lo Linen"), 353 U.S. 87, 95–96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957). A worker's employment rights are, as noted, to be determined by the union and the employer. The fact that the employer is a multiemployer organization thus does not alter the fact that there is no right to bargain individually, nor does it create an antitrust claim where none existed. *See Williams,* 45 F.3d at 693.

### 3. *Applying the Principles*

■ Once the ABA became obligated to recognize the ABA Players Association as the exclusive bargaining representative of the ABA players, therefore, Caldwell lost the right to seek the best bargain from individual ABA teams. Moreover, those teams became exempt from any antitrust rule that might have compelled them to compete individually for players represented by the Union. If the ABA and the Union had agreed in a collective agreement that Caldwell should be paid a fixed wage, or could be discharged for any reason not specifically prohibited by a federal law such as Title VII, he could not have challenged that agreement under the antitrust laws. *See Wood,* 809 F.2d at 962 n. 4. Moreover, as noted, even in the absence of a collective bargaining agreement,[2] Caldwell's right to challenge a discharge by the ABA had to be founded on labor rather than antitrust law.

Unlike the claim in *Wood,* Caldwell's claim regarding his discharge is not directly inconsistent with substantive federal labor law. Nevertheless, allowing Caldwell to proceed with his action would "subvert fundamental principles of our federal labor policy as set out in the National Labor Relations Act." *Wood,* 809 F.2d at 959. Caldwell alleges that the ABA refused him employment because of a position he had taken earlier as Union president and its resultant desire to exclude him from the NBA–ABA merger negotiations. The ABA claims that it refused him employment because of his physical limitations. This dispute is the familiar case of an employee asserting a discharge based on un-

ion activities, a violation of NLRA § 8(a)(3), and an employer claiming that the discharge was for cause. *See, e.g., Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 217, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964); *J.P. Stevens & Co. v. NLRB,* 380 F.2d 292, 300 (2d Cir.), *cert. denied,* 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967). Caldwell, however, chose not to pursue his claim under the NLRA. Instead, he sought relief under the Sherman Act.

As noted in preemption and sports labor/antitrust cases, it was Congress's determination that federal labor policy required a specialized agency equipped to find facts, to apply the NLRA, and to impose particular remedies. *See Amalgamated,* 403 U.S. at 285–86, 91 S.Ct. at 1917, *Brown,* 50 F.3d at 1045. By contrast, the present matter must be adjudicated by federal courts, which are, if Caldwell prevails, directed to award treble damages and attorney's fees, 15 U.S.C. § 15(a)—remedies not available under the NLRA. Indeed, if Caldwell is allowed to proceed with the present action, employees in similar circumstances will either never resort to the NLRB or will institute parallel administrative and antitrust proceedings with the risk of inconsistent adjudications. Every employee who is locked out by a multiemployer group, every striker who is not reinstated, and every employee who is discharged could bring an antitrust action similar to Caldwell's. Clearly, Congress had no such intention. As noted, the NLRA offers "a[n] array of rules and remedies ... and ... application of antitrust principles to a collective bargaining relationship would disrupt collective bargaining as we know it." *Williams,* 45 F.3d at 693.

The discussion above sets out principles that have been familiar to, and accepted by, the nation's workers for all of the NLRA's fifty years in every industry except professional sports. There is no precedent outside sports for ever initiating this genre of litigation. Indeed, as we noted in *Williams,* over a century had passed since the Sherman Act

---

**2.** However, the parties to a collective agreement are required to observe the terms of an expired collective agreement until they have bargained to an impasse. *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). In a sports league, if a collective agreement that authorized

individual bargaining expired but the status quo was being maintained, individual bargains could take place in the absence of a collective agreement. This exception to the general rule stated in the text does not affect the analysis.

was amended before a worker or union challenged multiemployer bargaining under the antitrust laws, as did the NBA Players' Association in that case. 45 F.3d at 689. Nevertheless, although professional athletes are a barely discernible fraction of the nation's unionized employees, similar litigation involving athletes abounds. *See Brown,* 50 F.3d 1041 (football); *Powell v. NFL,* 930 F.2d 1293 (8th Cir.1989) (football); *McCourt v. California Sports, Inc.,* 600 F.2d 1193 (6th Cir.1979) (hockey); *Smith v. Pro Football, Inc.,* 593 F.2d 1173 (D.C.Cir.1979) (football); *Mackey v. NFL,* 543 F.2d 606 (8th Cir.1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977) (football). However, we adhere to what we said in *Wood,* namely that "a wholly unprincipled, judge-made exception ... for professional athletes" should not be created. 809 F.2d at 961.

We therefore affirm.