Maurice CLARETT, Plaintiff–Appellee,

v.

NATIONAL FOOTBALL LEAGUE,
Defendant–Appellant.

Docket No. 04–0943.

United States Court of Appeals,
Second Circuit.

Argued: April 19, 2004.

Decided: May 24, 2004.

Gregg H. Levy, Covington & Burling (Joshua D. Wolson, James M. Garland, and Benjamin C. Block, on the brief), Washington, DC, for Defendant–Appellant.

Alan C. Milstein, Sherman, Silverstein, Kohl, Rose & Podolsky (Jeffrey P. Resnick; John B. Langel, Burt M. Rublin, and Amy L. Weiss, Ballard Spahr Andrews & Ingersoll, LLP; Robert A. Skirnick and Daniel B. Allanoff, Meredith Cohen Greenfogel & Skirnick; Robert A. McCormick, Michigan State University, on the brief), Pennsauken, NJ, for Plaintiff–Appellee.

G. Michael Pharis, Taylor, Porter, Brooks & Phillips L.L.P. (Fredrick R. Tully and Robert W. Barton, on the brief), Baton Rouge, LA, for Amicus Curiae American Football Coaches Association.

Jeffrey A. Mishkin, Skadden, Arps, Slate, Meagher & Flom LLP (Peter S. Julian and Darren C. Broughton; Richard W. Buchanan, National Basketball Association; William L. Daly and Julie Spar, National Hockey League, on the brief), New York, NY, for Amici Curiae National Basketball Association, the Women's National Basketball Association, and the National Hockey League.

Gregory L. Curtner, Miller, Canfield, Paddock & Stone, PLC (David R. Grand, on the brief), New York, NY, for Amicus Curiae National Collegiate Athletic Association.

James W. Quinn, Weil, Gotshal & Manges LLP (Bruce S. Meyer; Richard A. Berthelsen, National Football League Players Association; Jeffrey L. Kessler, Joseph Angland, and David G. Feher, Dewey Ballantine LLP, on the brief), New York, NY, for Amicus Curiae National Football League Players Association.

Perry H. Apelbaum, United States House of Representatives, Rep. John L. Conyers, Ranking Member, Committee on the Judiciary (Kanya A. Bennett, Stacey Dansky, and Michelle A. Persaud, on the brief), Washington, DC, for Amicus Curiae John Conyers, Jr., Member of Congress.

Before: SACK, SOTOMAYOR, Circuit Judges, and KAPLAN, District Judge.[*]

SOTOMAYOR, Circuit Judge.

Defendant-appellant National Football League ("NFL" or "the League") appeals from a judgment of the United States District Court for the Southern District of New York (Scheindlin, J.) ordering plaintiff-appellee Maurice Clarett ("Clarett") eligible to enter this year's NFL draft on the ground that the NFL's eligibility rules requiring Clarett to wait at least three full football seasons after his high school graduation before entering the draft violate antitrust laws. In reaching its conclusion, the district court held, *inter alia*, that the eligibility rules are not immune from antitrust scrutiny under the non-statutory labor exemption.[1] We disagree and reverse.

## BACKGROUND

Clarett, former running back for Ohio State University ("OSU") and Big Ten

---

[*] The Honorable Lewis A. Kaplan, Judge of the United States District Court for the Southern District of New York, sitting by designation.

[1] Because we find that the eligibility rules are immune from antitrust scrutiny under the non-statutory labor exemption, we do not ex- press an opinion on the district court's legal conclusions that Clarett alleged a sufficient antitrust injury to state a claim or that the eligibility rules constitute an unreasonable restraint of trade in violation of the antitrust laws.

Freshman of the Year, is an accomplished and talented amateur football player.[2] After gaining national attention as a high school player, Clarett became the first college freshman since 1943 to open as a starter at the position of running back for OSU. He led that team through an undefeated season, even scoring the winning touchdown in a double-overtime victory in the 2003 Fiesta Bowl to claim the national championship.[3] Prior to the start of his second college season, however, Clarett was suspended from college play by OSU for reasons widely reported but not relevant here.[4] Forced to sit out his entire sophomore season, Clarett is now interested in turning professional by entering the NFL draft. Clarett is precluded from so doing, however, under the NFL's current rules governing draft eligibility.

Founded in 1920, the NFL today is comprised of 32 member clubs and is by far the most successful professional football league in North America.[5] Because of the League's fiscal success and tremendous public following, a career as an NFL player "represents an unparalleled opportunity for an aspiring football player in terms of salary, publicity, endorsement opportunities, and level of competition." *Clarett*, 306 F.Supp.2d at 384. But since 1925, when Harold "Red" Grange provoked controversy by leaving college to join the Chicago Bears,[6] the NFL has required aspiring professional football players to wait a sufficient period of time after graduating high school to accommodate and encourage college attendance before entering the NFL draft. For much of the League's history, therefore, a player, irrespective of whether he actually attended college or not, was barred from entering the draft until he was at least four football seasons removed from high school. The eligibility rules were relaxed in 1990, however, to permit a player to enter the draft three full seasons after that player's high school graduation.

Clarett "graduated high school on December 11, 2001, two-thirds of the way through the 2001 NFL season" and is a season shy of the three necessary to qualify under the draft's eligibility rules. Clarett Decl. at ¶ 6. Unwilling to forego the prospect of a year of lucrative professional play or run the risk of a career-compromising injury were his entry into the draft delayed until next year, Clarett filed this suit alleging that the NFL's draft eligibility rules are an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

Because the major source of the parties' factual disputes is the relationship between the challenged eligibility rules and the current collective bargaining agreement governing the terms and conditions of employment for NFL players, some elaboration on both the collective bargaining agreement and the eligibility rules is warranted. The current collective bargaining agree-

---

**2.** These facts, except where otherwise noted, are undisputed and taken from the opinion of the district court. *See Clarett v. Nat'l Football League*, 306 F.Supp.2d 379, 382 (S.D.N.Y. 2004).

**3.** *See* Joe Drape, *Extra! Extra! It's Ohio State*, N.Y. Times, January 4, 2003, at D1.

**4.** *See* Mike Freeman, *Buckeyes Suspend Clarett For Year*, N.Y. Times, Sept. 11, 2003, at D1.

**5.** *See generally, United States Football League v. Nat'l Football League*, 842 F.2d 1335, 1343–45 (2d Cir.1988) (recounting history of professional football leagues in the United States).

**6.** *See* Gerald Eskenazi, *Red Grange, Football Hero of 1920's, Dead at 87*, N.Y. Times, Jan. 29, 1991, at B5.

ment between the NFL and its players union was negotiated between the NFL Management Council ("NFLMC"), which is the NFL member clubs' multi-employer bargaining unit, and the NFL Players Association ("NFLPA"), the NFL players' exclusive bargaining representative. This agreement became effective in 1993 and governs through 2007. Despite the collective bargaining agreement's comprehensiveness with respect to, *inter alia,* the manner in which the NFL clubs select rookies through the draft and the scheme by which rookie compensation is determined, the eligibility rules for the draft do not appear in the agreement.

At the time the collective bargaining agreement became effective, the eligibility rules appeared in the NFL Constitution and Bylaws, which had last been amended in 1992.[7] Specifically, Article XII of the Bylaws ("Article XII"), entitled "Eligibility of Players," prohibited member clubs from selecting any college football player through the draft process who had not first exhausted all college football eligibility, graduated from college, or been out of high school for five football seasons. Clubs were further barred from drafting any person who either did not attend college, or attended college but did not play football, unless that person had been out of high school for four football seasons. Article XII, however, also included an exception that permitted clubs to draft players who had received "Special Eligibility" from the NFL Commissioner. In order to qualify for such special eligibility, a player was required to submit an application before

January 6 of the year that he wished to enter the draft and "at least three NFL seasons must have elapsed since the player was graduated from high school." The Commissioner's practice apparently was, and still is, to grant such an application so long as three full football seasons have passed since a player's high school graduation.[8] Appellant's Brief, at 7 n. 3.

Although the eligibility rules do not appear in the text of the collective bargaining agreement, the NFL Constitution and Bylaws that at the time of the agreement's adoption contained the eligibility rules are mentioned in three separate provisions relevant to our discussion. First, in Article III, Section 1 (Scope of Agreement), the collective bargaining agreement states:

> This Agreement represents the complete understanding of the parties as to all subjects covered herein, and there will be no change in the terms and conditions of this Agreement without mutual consent .... [T]he NFLPA and the Management Council waive any rights to bargain with one another concerning any subject covered or not covered in this Agreement for the duration of this Agreement, *including the provisions of the NFL Constitution and Bylaws;* provided, however, that if any proposed change in the NFL Constitution and Bylaws during the term of this Agreement could significantly affect the terms and conditions of employment of NFL players, then the [NFLMC] will give the NFLPA notice of and negotiate the proposed change in good faith.

7. After the Constitution and Bylaws were amended in 1992, a revised copy was sent by the NFL Commissioner to all club owners, presidents and general managers. A memorandum from the Commissioner that accompanied the revised Constitution and Bylaws noted that changes had been made to the eligibility rules.

8. At oral argument, counsel for Clarett clarified that his challenge is not limited to the "Special Eligibility" rule, as his papers on appeal might suggest, but extends to any and all of the eligibility rules that would keep Clarett from entering the NFL draft this year. We refer to these rules collectively as "the eligibility rules."

(emphasis added). Second, Article IV, Section 2 (No Suit) provides generally that "neither [the NFLPA] nor any of its members" will sue or support a suit "relating to the presently existing provisions of the Constitution and Bylaws of the NFL as they are currently operative and administered." Third, Article IX, Section 1 (Non–Injury Grievance) makes "[a]ny dispute . . . involving the interpretation of, application of, or compliance with, . . . any applicable provision of the NFL Constitution and Bylaws pertaining to terms and conditions of employment of NFL players" subject to the grievance procedures afforded under the collective bargaining agreement.

Before the collective bargaining agreement became effective, a copy of the Constitution and Bylaws, as amended in 1992, was provided by the NFL to the NFLPA along with a letter, dated May 6, 1993, that "confirm[ed] that the attached documents are the presently existing provisions of the Constitution and Bylaws of the NFL referenced in Article IV, Section 2, of the Collective Bargaining Agreement." The May 6 letter was signed by representatives of the NFL and the NFLPA. The only other evidence presented to the district court by the NFL concerning the negotiation of the collective bargaining agreement were the two declarations of Peter Ruocco, Senior Vice President of Labor Relations at the NFLMC. In the second declaration, Ruocco attests that "[d]uring the course of

collective bargaining that led to the [collective bargaining agreement], the [challenged] eligibility rule itself was the subject of collective bargaining." Ruocco Decl. at ¶ 8.

In 2003, ten years into the life of the collective bargaining agreement, Article XII was amended. Although the substance of most of the eligibility rules was retained, the "Special Eligibility" provision was removed and substituted with the following[9]:

> If four seasons have not elapsed since the player discontinued high school, he is ineligible for selection, but may apply to the Commissioner for special eligibility.

The Bylaws then refer to a separate memorandum issued by the Commissioner on February 16, 1990—three years before the current collective bargaining agreement became effective—pursuant to his authority under the Bylaws to establish necessary policies and procedures. That memorandum states that "[a]pplications for special eligibility for the 1990 draft will be accepted only from college players as to whom three full *college* seasons have elapsed since their high school graduation." (emphasis added).[10] It is this version of the eligibility rules that the NFL relies upon in refusing Clarett special eligibility for this year's draft, and it is this version of

9. Although Article III, Section 1 of the collective bargaining agreement obligates the NFL to notify the players union of, and to bargain over, any change to the Bylaws that "could significantly affect the terms and conditions" of players' employment, the record is silent as to whether the NFL or the players union considered the changes to Article XII significant, whether the NFL notified the players union of these changes, or whether the changes were bargained over.

10. Whereas the pre–2003 version of the Constitution and Bylaws authorized special eligi-

bility for players after the passing of "three NFL seasons," the current eligibility rules as established by the Bylaws and the Commissioner's memorandum require that "three full college seasons" have elapsed. Clarett is neither three NFL seasons nor three college seasons out of high school. Because the difference is immaterial for our purposes, we use the less specific "three football seasons" when referring to the amount of time after graduating high school a player must wait before entering the draft.

the eligibility rules that Clarett seeks to invalidate.

After Clarett filed this suit in September 2003, the parties conducted limited discovery and thereafter moved for summary judgment. Clarett sought summary judgment on the merits of his antitrust claim. The NFL asserted that Clarett lacked "antitrust standing" and that, as a matter of law, the eligibility rules were immune from antitrust attack by virtue of the non-statutory labor exemption. On February 5, 2004, the district court granted summary judgment in favor of Clarett and ordered him eligible to enter this year's draft. *Clarett*, 306 F.Supp.2d at 410–11. First, relying on the test articulated by the Eighth Circuit in *Mackey v. National Football League*, 543 F.2d 606 (8th Cir. 1976), the district court rejected the NFL's argument that the antitrust laws are inapplicable to the eligibility rules because they fall within the non-statutory labor exemption to the antitrust laws. *Clarett*, 306 F.Supp.2d at 397. Specifically, the district court held that the exemption does not apply because the eligibility rules: 1) are not mandatory subjects of collective bargaining, 2) affect only "complete strangers to the bargaining relationship," and 3) were not shown to be the product of arm's-length negotiations between the NFL and its players union. *Id.* at 393–97.

Second, the district court ruled against the NFL on its contention that Clarett lacked standing because he had not demonstrated a sufficient "antitrust injury" to maintain this suit, holding that the "inability to compete in the market" for NFL players' services is sufficient injury for antitrust purposes. *Id.* at 403.

Third, on the merits of Clarett's antitrust claim, the district court found that the eligibility rules were so "blatantly anticompetitive" that only a "quick look" at the NFL's procompetitive justifications was necessary to reach the conclusion that the eligibility rules were unlawful under the antitrust laws. *Id.* at 408. The NFL had argued that because the eligibility rules prevent less physically and emotionally mature players from entering the league, they justify any incidental anticompetitive effect on the market for NFL players. *Id.* In so doing, according to the NFL, the eligibility rules guard against less-prepared and younger players entering the League and risking injury to themselves, prevent the sport from being devalued by the higher number of injuries to those young players, protect its member clubs from having to bear the costs of such injuries, and discourage aspiring amateur football players from enhancing their physical condition through unhealthy methods. *Id.* at 408–09. The district court held that all of these justifications were inadequate as a matter of law, concluding that the NFL's purported concerns could be addressed through less restrictive but equally effective means. *Id.* at 410. Finding that the eligibility rules violated the antitrust laws, the district court entered judgment in favor of Clarett, and, recognizing that this year's draft was then just over two months away, issued an order deeming Clarett eligible to participate in the draft.

The NFL subsequently moved for a stay pending appeal, which the district court denied. *Clarett v. Nat'l Football League*, 306 F.Supp.2d 411 (S.D.N.Y.2004). After filing a notice of appeal, the NFL petitioned to have the appeal heard on an expedited basis and again moved to stay the district court's order pending appeal. On March 30, 2004, we agreed to hear the appeal on an expedited basis and set a substantially compressed briefing schedule. Following oral argument on April 19, we granted the NFL's motion to stay the

district court's order, citing the NFL's "likelihood of success on the merits" and noting that the resulting harm to Clarett was mitigated by the NFL's promise to "hold a supplemental draft for [Clarett] and all others similarly situated" were the district court's judgment affirmed. Order of April 19, 2004. Clarett thereafter made successive applications to two Justices of the Supreme Court to lift this Court's stay order. Both applications were denied. Clarett did not participate in the NFL draft held on April 24 and 25, 2004.

## DISCUSSION

Clarett argues that the NFL clubs are horizontal competitors for the labor of professional football players and thus may not agree that a player will be hired only after three full football seasons have elapsed following that player's high school graduation. That characterization, however, neglects that the labor market for NFL players is organized around a collective bargaining relationship that is provided for and promoted by federal labor law, and that the NFL clubs, as a multi-employer bargaining unit, can act jointly in setting the terms and conditions of players' employment and the rules of the sport without risking antitrust liability. For those reasons, the NFL argues that federal labor law favoring and governing the collective bargaining process precludes the application of the antitrust laws to its eligibility rules. We agree.

The district court's denial of the NFL's motion for summary judgment is reviewed

*de novo,* and all factual inferences are drawn in favor of Clarett. *See Amnesty America v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir.2004).

## I.

Although "[t]he interaction of the [antitrust laws] and federal labor legislation is an area of law marked more by controversy than by clarity," *Wood v. Nat'l Basketball Ass'n,* 809 F.2d 954, 959 (2d Cir.1987) (citing R. Gorman, *Labor Law, Unionization and Collective Bargaining* 631–35 (1976)), it has long been recognized that in order to accommodate the collective bargaining process, certain concerted activity among and between labor and employers must be held to be beyond the reach of the antitrust laws. *See United States v. Hutcheson,* 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941); *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). Courts, therefore, have carved out two categories of labor exemptions to the antitrust laws: the so-called statutory and non-statutory exemptions.[11] We deal here only with the non-statutory exemption.

The non-statutory exemption has been inferred "from federal labor statutes, which set forth a national labor policy favoring free and private collective bargaining; which require good-faith bargaining over wages, hours, and working conditions; and which delegate related rulemaking and interpretive authority to the National Labor Relations Board." *Brown v. Pro Football, Inc.,* 518 U.S. 231, 236, 116 S.Ct. 2116,

---

**11.** The statutory exemption, so named because it is derived from the texts of the Clayton Act, 15 U.S.C. § 17, 29 U.S.C. § 52, and the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.,* shields from the antitrust laws certain unilateral conduct of labor groups such as boycotts and picketing. *See H.A. Artists & Assocs., Inc. v. Actors' Equity Ass'n,* 451 U.S. 704, 714–15, 101 S.Ct. 2102, 68 L.Ed.2d 558

(1981). Because the statutory exemption does not provide any protection for "concerted action or agreements between unions and nonlabor parties," *Connell Constr. Co. v. Plumbers & Steamfitters Local No. 100,* 421 U.S. 616, 622, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), the NFL does not rely on the statutory exemption in arguing that its eligibility rules are immune from the antitrust laws.

135 L.Ed.2d 521 (1996) (internal citations omitted). The exemption exists not only to prevent the courts from usurping the NLRB's function of "determin[ing], in the area of industrial conflict, what is or is not a 'reasonable' practice," but also "to allow meaningful collective bargaining to take place" by protecting "some restraints on competition imposed through the bargaining process" from antitrust scrutiny. *Id.* at 237, 116 S.Ct. 2116.

The Supreme Court has never delineated the precise boundaries of the exemption, and what guidance it has given as to its application has come mostly in cases in which agreements between an employer and a labor union were alleged to have injured or eliminated a competitor in the employer's business or product market. In the face of such allegations, the Court has largely permitted antitrust scrutiny in spite of any resulting detriment to the labor policies favoring collective bargaining.

In the first case to deal squarely with the non-statutory exemption, *Allen Bradley Co. v. Local No. 3, International Brotherhood of Electrical Workers,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), the New York City electrical workers union negotiated a series of agreements in which local manufacturers and contractors agreed to deal only with other manufacturers and contractors that employed the union's members. *Id.* at 799–800, 65 S.Ct. 1533. A non-local manufacturer that was excluded from the market as a result successfully sued under the antitrust laws, establishing that these agreements were "but one element in a far larger program in which contractors and manufacturers united with one another to monopolize all the business in New York City, to bar all other business men from that area, and to charge the public prices above a competitive level." *Id.* at 809, 65

S.Ct. 1533. Although the Court recognized that the union sought the agreements out of "a desire to get and hold jobs for themselves at good wages and under high working standards," it held that the non-statutory exemption did not apply where unions "combine with employers and with manufacturers of goods to restrain competition in, and to monopolize the marketing of, such goods." *Id.* at 798, 65 S.Ct. 1533.

Twenty years later, the Court considered two cases dealing with the non-statutory exemption. Although the Court again refused to apply the non-statutory exemption in the first, *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), it did apply the exemption in *Local No. 189, Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co.,* 381 U.S. 676, 85 S.Ct. 1607, 14 L.Ed.2d 626 (1965). In *Pennington,* a small coal mine operator claimed that a miners union violated the antitrust laws by agreeing with large coal mine companies that the union would demand a higher wage scale from small coal mine operators in an effort to drive the small mine operators from the market. Echoing its decision in *Allen Bradley,* the Court held that while "a union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers" without incurring antitrust liability, "a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units." *Pennington,* 381 U.S. at 665, 85 S.Ct. 1585.

The Court, however, reached a different result in *Jewel Tea,* which involved a challenge to a collective bargaining agreement between the butchers union and meat sellers in Chicago, whereby the meat sellers

agreed to limit the operation of meat counters to certain hours. *See Jewel Tea,* 381 U.S. at 679–80, 85 S.Ct. 1607. The union sought the restriction not only to cabin the hours in the workday but also to diminish the threat posed to members' job security by evening sales of prepackaged meat and the nighttime use of unskilled labor. *Id.* at 682, 85 S.Ct. 1607. Jewel Tea was one of the meat sellers that signed the agreement. It did so, however, only under pressure from the union and then challenged the hours restriction on antitrust grounds. Jewel Tea notably did not allege that the hours restriction eliminated competition among the meat sellers that made up the bargaining unit or that the union sought the hours restriction from Jewel Tea at the behest of other meat sellers. *Id.* at 688, 85 S.Ct. 1607.

A majority of the Court agreed that the hours restriction fell within the non-statutory exemption, but the Justices disagreed as to the reason for applying the exemption. Justice White, writing for himself and two other Justices, advocated that the application of the non-statutory exemption should be determined by balancing the "interests of union members" served by the restraint against "its relative impact on the product market." *Id.* at 690 n. 5, 85 S.Ct. 1607. Applying that test, Justice White held that the hours restriction was

> so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision through bona fide, arm's-length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups, falls within the protection of the national labor policy and is therefore exempt from the Sherman Act.

*Id.* at 689–90, 85 S.Ct. 1607.[12]

Concurring in *Jewel Tea* but dissenting in *Pennington,* Justice Goldberg, writing for himself and two Justices, found that no such balancing was necessary. Because federal labor law obligates the union and employer to bargain in good faith and permits unions to strike over those issues that relate to workers' wages, hours, or terms and conditions of employment, Justice Goldberg found that it would "stultify the congressional scheme" to expose collective bargaining agreements on these so-called mandatory bargaining subjects to antitrust liability. *Id.* at 712, 85 S.Ct. 1585. Therefore, according to Justice Goldberg, all "collective bargaining activity concerning mandatory subjects of bargaining under the [labor laws] is not subject to the antitrust laws." *Id.* at 710, 85 S.Ct. 1585.

Another ten years later, in *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), the Court held the non-statutory exemption did not protect a union's agreement with a contractor that bound the contractor to deal only with subcontractors that employed the union's members. The challenged agreement was not a collective bargaining agreement, and the union did not represent the contractor's employees; rather, the contractor acceded to the agreement only after the union picketed one of its facilities. *Id.* at 619, 95 S.Ct. 1830. The Court refused to apply the exemption to this "kind of direct restraint on the business market[, which] has sub-

**12.** When confronted with allegations that agreements between labor and employers damaged competition in the business or product market, we have previously regarded Justice White's decision in *Jewel Tea* as setting forth the "classic formulation" of the non-statutory exemption. *See Local 210, Laborers' Int'l Union v. Labor Relations Div. Associated Gen. Contractors of Am.,* 844 F.2d 69, 79 (2d Cir.1988); *Berman Enters. Inc. v. Local 333, United Marine Div., Int'l Longshoremen's Ass'n,* 644 F.2d 930, 935 n. 8 (2d Cir.1981).

stantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions." *Id.* at 625, 95 S.Ct. 1830.

Contending that these cases establish the applicable boundaries of the non-statutory exemption to be applied in the present case, Clarett argues that the NFL's eligibility rules lack all of the characteristics that led Justice White to apply the exemption in *Jewel Tea.* Clarett, furthermore, maintains that the boundaries of the exemption were properly identified in, and thus we should follow, the Eighth Circuit's decision in *Mackey v. National Football League,* 543 F.2d 606 (8th Cir.1976). *Mackey* involved a challenge brought by NFL players to the League's so-called "Rozelle Rule," which required NFL clubs to compensate any club from which they hired away a player whose contract had expired. *Id.* at 609. Presenting arguments not dissimilar from those made in the present case, the players in *Mackey* alleged that the Rozelle Rule constituted an unlawful conspiracy amongst the NFL clubs to restrain players' abilities freely to contract their services. The NFL, for its part, asserted that the Rozelle Rule was exempt from the antitrust laws by virtue of its inclusion in the League's collective bargaining agreement with the players union. Noting that the Supreme Court had to that point applied the non-statutory exemption only in *Jewel Tea,* the Eighth Circuit gleaned from the Court's decisions, and Justice White's opinion in *Jewel Tea* in particular, that in order to fall within the non-statutory exemption, a restraint must: 1) primarily affect only the parties to the collective bargaining relationship, 2) concern a mandatory subject of collective bargaining, and 3) be the product of bona fide arm's-length bargaining. *Id.* at 614. Although the Eighth Circuit found that the Rozelle Rule satisfied the first two prongs,

it nonetheless refused to apply the exemption after finding that the Rozelle Rule was not the product of arm's-length negotiations. *Id.* at 615–16. Noting that the Rozelle Rule predated the advent of the collective bargaining relationship between the NFL and its players union, the Eighth Circuit found that the record lacked sufficient evidence to conclude that the players union had received some *quid pro quo* in exchange for including the Rule in the collective bargaining agreement. *Id.* at 616. For that reason, the Eighth Circuit held that the Rozelle Rule did not fall within the non-statutory exemption, and the Rule was invalidated on antitrust grounds. *Id.* at 621–22.

Relying on *Mackey,* the district court below held that the non-statutory exemption provides no protection to the NFL's draft eligibility rules, because the eligibility rules fail to satisfy any of the three *Mackey* factors. *Clarett,* 306 F.Supp.2d at 397. Specifically, the district court found that the rules exclude strangers to the bargaining relationship from entering the draft, do not concern wages, hours or working conditions of current NFL players, and were not the product of bona fide arm's-length negotiations during the process that culminated in the current collective bargaining agreement. *Id.* at 395–97.

We, however, have never regarded the Eighth Circuit's test in *Mackey* as defining the appropriate limits of the non-statutory exemption. *See Local 210, Laborers' Int'l Union,* 844 F.2d at 80 n. 2 (declining to follow *Mackey* in favor of balancing test articulated in *Jewel Tea* ); *see also United States Football League v. Nat'l Football League,* 842 F.2d 1335, 1372 (2d Cir.1988) (recognizing *Mackey* is "not consistent with our decision in *Wood v. National Basketball Ass'n* "). Moreover, we disagree with the Eighth Circuit's assumption in *Mackey* that the Supreme Court's deci-

sions in *Connell, Jewel Tea, Pennington,* and *Allen Bradley* dictate the appropriate boundaries of the non-statutory exemption for cases in which the only alleged anti-competitive effect of the challenged restraint is on a labor market organized around a collective bargaining relationship. Indeed, we have previously recognized that these decisions are of limited assistance in determining whether an athlete can challenge restraints on the market for professional sports players imposed through a collective bargaining process, because all "involved injuries to *employers* who asserted that they were being excluded from competition in the product market." [13] *Wood v. Nat'l Basketball Ass'n,* 809 F.2d 954, 963 (2d Cir.1987) (emphasis in original).[14]

Clarett does not contend that the NFL's draft eligibility rules work to the disadvantage of the NFL's competitors in the market for professional football or in some manner protect the NFL's dominance in that market. *Compare N. Am. Soccer League v. Nat'l Football League,* 670 F.2d 1249 (2d Cir.1982). He challenges the eligibility rules only on the ground that they are an unreasonable restraint upon the

market for players' services. *See Clarett,* 306 F.Supp.2d at 399. Thus, we need not decide here whether the *Mackey* factors aptly characterize the limits of the exemption in cases in which employers use agreements with their unions to disadvantage their competitors in the product or business market, because our cases have counseled a decidedly different approach where, as here, the plaintiff complains of a restraint upon a unionized labor market characterized by a collective bargaining relationship with a multi-employer bargaining unit. *See Caldwell v. Am. Basketball Ass'n,* 66 F.3d 523 (2d Cir.1995); *Nat'l Basketball Ass'n v. Williams,* 45 F.3d 684 (2d Cir.1995); *Wood v. Nat'l Basketball Ass'n,* 809 F.2d 954 (2d Cir.1987). Moreover, as the discussion below makes clear, the suggestion that the *Mackey* factors provide the proper guideposts in this case simply does not comport with the Supreme Court's most recent treatment of the non-statutory labor exemption in *Brown v. Pro Football, Inc.,* 518 U.S. 231, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996).

## II.

Our decisions in *Caldwell, Williams,* and *Wood* all involved players' claims that the

---

**13.** Although Justice White in his opinion in *Jewel Tea* stated that the plaintiff had "not allege[d] that it ha[d] been injured by the elimination of competition among the other employers within the unit with respect to marketing hours," *Jewel Tea,* 381 U.S. at 688, 85 S.Ct. 1607, Justice Goldberg in his concurrence noted that it was conceded on that record that the uniform hours restriction challenged in that cases aided "small employers at the expense of the large," *id.* at 699, 85 S.Ct. 1607.

**14.** We are not the only circuit to have drawn this distinction. *See, e.g., Brown v. Pro Football, Inc.,* 50 F.3d 1041, 1056 (D.C.Cir.1995), *aff'd,* 518 U.S. 231, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996) ("[T]he nonstatutory labor exemption waives antitrust liability for restraints on competition imposed through the collective bargaining process, so long as such

restraints operate primarily in a labor market characterized by collective bargaining."); *Mid-America Reg'l Bargaining Ass'n v. Will County Carpenters Dist. Council,* 675 F.2d 881, 893 (7th Cir.1982) ("[Non-statutory exemption applies where] restraint ... alleged is not a 'direct restraint on the business market' but rather a direct restraint on the labor market, with only tangential effects on the business market."); *Consol. Express, Inc. v. N.Y. Shipping Ass'n,* 602 F.2d 494, 513 (3d Cir.1979), *vacated on other grounds,* 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980) ("The term nonstatutory exemption ... is a shorthand description of an interpretation of the Sherman Act, making that statute inapplicable to restraints imposed in the interest of lawful union monopoly power in the labor market.").

concerted action of a professional sports league imposed a restraint upon the labor market for players' services and thus violated the antitrust laws. In each case, however, we held that the non-statutory labor exemption defeated the players' claims. Our analysis in each case was rooted in the observation that the relationships among the defendant sports leagues and their players were governed by collective bargaining agreements and thus were subject to the carefully structured regime established by federal labor laws. We reasoned that to permit antitrust suits against sports leagues on the ground that their concerted action imposed a restraint upon the labor market would seriously undermine many of the policies embodied by these labor laws, including the congressional policy favoring collective bargaining, the bargaining parties' freedom of contract, and the widespread use of multi-employer bargaining units. Subsequent to our decisions in this area, similar reasoning led the Supreme Court in *Brown v. Pro Football, Inc.*, 518 U.S. 231, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996), to hold that the non-statutory exemption protected the NFL's unilateral implementation of new salary caps for developmental squad players after its collective bargaining agreement with the NFL players union had expired and negotiations with the union over that proposal reached an impasse. We need only retrace the path laid down by these prior cases to reach the conclusion that Clarett's antitrust claims must fail.

### A.

The plaintiff in *Wood,* O. Leon Wood, was a star college basketball player who, after being drafted by the Philadelphia 76ers, sued the NBA alleging that its poli-

cies regarding, *inter alia,* the entry draft process and team salary caps constituted unlawful agreements among horizontal competitors to eliminate competition for college players.[15] *Wood,* 809 F.2d at 956–58. All of the challenged policies, however, were included in a collective bargaining agreement and memorandum of understanding between the NBA and its players union. *Id.* at 957–58. Because these agreements were the result of the federally mandated bargaining process through which the union and the NBA, in light of the unique economic imperatives of professional basketball, negotiated a host of creative solutions to settle their differences, we held that to permit Wood to challenge particular aspects of their agreement on antitrust grounds would "subvert fundamental principles of our federal labor policy." *Id.* at 959.

Specifically, we found that Wood's claim that the NBA's agreements prevented him from becoming a free agent and negotiating directly with the teams for the best salary contravened the principle of federal labor law that once a majority of employees votes to unionize and elects a representative, individual employees—whether in the bargaining unit or not—no longer possess the right to negotiate with the employer for the best deal possible. *Id.* at 959–60 (citing 29 U.S.C. § 159(a)). Rather, the union representative is charged with the responsibility of seeking the best overall deal for employees, which often means that some employees or prospective employees may fare worse than they would in a competitive market free from restraints. *Id.* We further rejected Wood's contention that the non-statutory exemption did not preclude his challenge because he was not a member of the union when the collective bargaining agreement be-

---

**15.** The challenge to the NBA draft in *Wood,* as with the challenge in *Williams,* discussed *in-* *fra,* did not include any claim against the rules governing eligibility for the draft.

came effective, observing that new union members often find themselves disadvantaged vis-a-vis more senior union members and that collective bargaining units commonly disadvantage employees outside of, or about to enter, the union. *Id.* at 960.

We also reasoned that to allow Wood to cherry-pick the particular policies with which he took issue would run counter to the "freedom of contract" that labor law intends unions and employers to have during the collective bargaining process, because Wood could negate aspects of the "unique bundle of compromises" struck between the NBA and its players on their way to a peaceful and efficient resolution of their differences. *Id.* at 961. Particularly because Wood challenged agreements concerning mandatory subjects of bargaining, to which labor law attaches a host of rights and obligations, we saw no place for the application of the antitrust laws and found the non-statutory exemption applicable. *Id.* at 962.

Eight years later, in *Williams,* a class of professional basketball players again brought an antitrust suit challenging, *inter alia,* the NBA's draft process and salary caps. *Williams,* 45 F.3d at 685–86. This time, however, the restraints challenged by the players were not encompassed in any effective agreement between the NBA and its players union, because the collective bargaining agreement had expired. *Id.* at 686. The challenged policies were implemented unilaterally by the NBA after negotiations with the players union on these subjects reached an impasse. *Id.* We nevertheless held that the NBA's conduct fell within the non-statutory exemption. *Id.* at 693. Foremost, we found that the players' antitrust claims were inconsistent with federal labor law because they imperiled the legitimacy of multi-employer bargaining, "a process by which employers band together to act as a single entity in

bargaining with a common union." *Id.* at 688. From the standpoint of our labor and antitrust laws, we explained that such multi-employer bargaining units are a long-accepted and commonplace means of giving employers the tactical and practical advantages of collective action. *Id.* at 688–93. Moreover, in the context of sports leagues, we observed that multi-employer bargaining units serve the additional, important purpose of allowing the teams to establish and demand uniformity in the rules necessary for the proper functioning of the sport. *Id.* at 689. Second, we found that legality of conduct undertaken in the course of negotiations over a collective bargaining agreement is an issue committed to the specialized knowledge of the National Labor Relations Board, for which federal labor law provides a "soup-to-nuts array of rules and remedies." *Id.* at 693. Because permitting courts to police that same conduct under the auspices of the antitrust laws would disrupt that remedial scheme, we held that the non-statutory exemption was applicable. *Id.* at 693.

That same year, in *Caldwell,* we heard the appeal of Joe L. Caldwell, a former professional basketball player who after four successful seasons of play was suspended from his team in 1974 and never returned to the game. *Caldwell,* 66 F.3d at 525–26. While a basketball player, Caldwell represented the players in labor negotiations with the league and claimed to have incurred the scorn of his league, the American Basketball Association ("ABA"), as a result. *Id.* at 526. He alleged that the teams consequently agreed among themselves, in violation of the antitrust laws, that he should be fired and then blacklisted from professional play. *Id.* Despite the district court's finding that the case could "be entirely resolved without any reference whatsoever to the" collective bargaining agreement between the ABA and its players union, *id.*

at 529 n. 1, we held that the non-statutory exemption defeated Caldwell's claims, *id.* at 527.

In *Caldwell*, our analysis began with the observation that "[t]he inception of a collective bargaining relationship between employees and employers irrevocably alters the governing legal regime." *Id.* at 527–28 (quoting *Brown v. Pro Football, Inc.*, 50 F.3d 1041, 1054 (D.C.Cir.1995), *aff'd* 518 U.S. 231, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996)). We found that as a consequence of the collective bargaining relationship between the ABA and its players union, Caldwell's claims, insofar as they concerned the "circumstances under which an employer may discharge or refuse to hire an employee," involved a mandatory bargaining subject. *Id.* at 529. Thus, federal labor law afforded Caldwell a host of administrative and judicial remedies to contest the parties' agreements on the subject, as well as his firing and any team's refusal to rehire him. *Id.* Drawing upon our discussion of multi-employer bargaining units in *Williams*, we then observed that the legality *vel non* of his treatment did not become a question of antitrust law simply because the "employers acted jointly in refusing employment." *Id.* Because such issues are remediable under labor law, we concluded that the non-statutory exemption applied.

The following year, in *Brown*, the Supreme Court was presented with facts similar to *Williams*, and eight Justices agreed that the non-statutory exemption precludes antitrust claims against a professional sports league for unilaterally setting policy with respect to mandatory bargaining subjects after negotiations with the players union over those subjects reach impasse. *Brown*, 518 U.S. at 240–42, 116 S.Ct. 2116. There, a class of professional football players challenged the NFL's unilateral institution of a policy that permit-

ted each team to establish a new squad of developmental players and capped those players' weekly salaries after negotiations with the players union over that proposal became deadlocked. *Id.* at 234–35, 116 S.Ct. 2116. Approaching the issue largely as a "matter of logic," *id.* at 237, 116 S.Ct. 2116, the Court found that to permit antitrust liability in such a case would call into question a great deal of conduct, such as multi-employer bargaining, that federal labor policy promotes and for which labor law provides an array of rules and remedies, *id.* at 237–42, 116 S.Ct. 2116. The Court held that the non-statutory labor exemption necessarily applied not only to protect such labor policies but also to prevent "antitrust courts" from usurping the NLRB's responsibility for policing the collective bargaining process. *Id.* at 240–42, 116 S.Ct. 2116.

The Court also rejected a number of potential limits on the exemption that were raised by the players and their supporters. First, the Court held that the exemption was not so narrow as to protect only agreements between the parties that are embodied in an existing collective bargaining agreement. *Id.* at 243–44, 116 S.Ct. 2116. Second, in finding that the League's post-impasse action was protected by the exemption, the Court dismissed the suggestion that the exemption should insulate the concerted action of employers only up to the point at which negotiations reach impasse or a "reasonable time" thereafter. *Id.* at 244–47, 116 S.Ct. 2116. Third, the Court rejected the notion that courts in applying the exemption could distinguish between bargaining "tactics," which the players argued should be exempt, and unilaterally imposed "terms." *Id.* at 247–48, 116 S.Ct. 2116. Finally, the Court refused the players' contention that the labor of professional sports players was unique and that the market for players' services therefore should be treated differently than oth-

er organized labor markets for purposes of the non-statutory exemption. *Id.* at 248–49, 116 S.Ct. 2116.

Although the Court in *Brown* held that the non-statutory exemption applied, it left the precise contours of the exemption undefined. *Id.* at 250, 116 S.Ct. 2116. In so doing, the Court found it unnecessary to embrace, and indeed expressed some reservations about, the broader holding of the court of appeals that the non-statutory exemption "waiv[es] antitrust liability for restraints on competition imposed through the collective-bargaining process, so long as such restraints operate primarily in a labor market characterized by collective bargaining." *Id.* at 235, 116 S.Ct. 2116.

Clarett argues that his case differs in material respects from *Brown*, but he does not argue, nor do we find, that the Supreme Court's treatment of the non-statutory exemption in that case gives reason to doubt the authority of our prior decisions in *Caldwell, Williams*, and *Wood*. Because we find that our prior decisions in this area fully comport—in approach and result—with the Supreme Court's decision in *Brown*, we regard them as controlling authority. In light of the foregoing jurisprudence, we therefore proceed to the merits of this appeal.

### B.

Clarett argues that he is physically qualified to play professional football and that the antitrust laws preclude the NFL teams from agreeing amongst themselves that they will refuse to deal with him simply because he is less than three full football seasons out of high school. Such an arbitrary condition, he argues, imposes an unreasonable restraint upon the competitive market for professional football players' services, and, because it excludes him from entering that market altogether, constitutes a *per se* antitrust violation. The

issue we must decide is whether subjecting the NFL's eligibility rules to antitrust scrutiny would "subvert fundamental principles of our federal labor policy." *Wood,* 809 F.2d at 959. For the reasons that follow, we hold that it would and that the non-statutory exemption therefore applies.

Although the NFL has maintained draft eligibility rules in one form or another for much of its history, the "inception of a collective bargaining relationship" between the NFL and its players union some thirty years ago "irrevocably alter[ed] the governing legal regime." *Caldwell,* 66 F.3d at 527. Our prior cases highlight a number of consequences resulting from the advent of this collective bargaining relationship that are relevant to Clarett's litigation. For one, prospective players no longer have the right to negotiate directly with the NFL teams over the terms and conditions of their employment. That responsibility is instead committed to the NFL and the players union to accomplish through the collective bargaining process, and throughout that process the NFL and the players union are to have the freedom to craft creative solutions to their differences in light of the economic imperatives of their industry. Furthermore, the NFL teams are permitted to engage in joint conduct with respect to the terms and conditions of players' employment as a multi-employer bargaining unit without risking antitrust liability. The arguments Clarett advances in support of his antitrust claim, however, run counter to each of these basic principles of federal labor law.

█ Because the NFL players have unionized and have selected the NFLPA as its exclusive bargaining representative, labor law prohibits Clarett from negotiating directly the terms and conditions of his employment with any NFL club, *see NLRB v. Allis–Chalmers Mfg. Co.,* 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d

1123 (1967), and an NFL club would commit an unfair labor practice were it to bargain with Clarett individually without the union's consent, *see Medo Photo Supply Corp. v. NLRB,* 321 U.S. 678, 683, 64 S.Ct. 830, 88 L.Ed. 1007 (1944).[16] The terms and conditions of Clarett's employment are instead committed to the collective bargaining table and are reserved to the NFL and the players union's selected representative to negotiate. *Allis–Chalmers Mfg. Co.,* 388 U.S. at 180, 87 S.Ct. 2001.

■ The players union's representative possesses "powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents." *Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants,* 489 U.S. 426, 458–59, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989) (quoting *Steele v. Louisville & Nashville R. Co.,* 323 U.S. 192, 202, 65 S.Ct. 226, 89 L.Ed. 173 (1944)). In seeking the best deal for NFL players overall, the representative has the ability to advantage certain categories of players over others, subject of course to the representative's duty of fair representation. *See Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The union representative may, for example, favor veteran players over rookies, *see Ford Motor Co. v. Huffman,* 345 U.S. 330, 338–39, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), and can seek to preserve jobs for current players to the detriment of new employees and the exclusion of outsiders, *see Fibreboard Paper Prods. Corp v. NLRB,* 379 U.S. 203, 210–15, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); *Wood,* 809 F.2d at 960 & n. 3. This authority and exclusive responsibility is vested in the players' representative "once a mandatory collective bargaining relationship is established and continues throughout the relationship." *Caldwell,* 66 F.3d at 528. For the duration of that relationship, federal labor law then establishes a " 'soup-to-nuts array' of rules, tribunals and remedies to govern [the collective bargaining] process." *Id.* at 529 (quoting *Williams,* 45 F.3d at 693).

■ Clarett's argument that antitrust law should permit him to circumvent this scheme established by federal labor law starts with the contention that the eligibility rules do not constitute a mandatory subject of collective bargaining and thus cannot fall within the protection of the non-statutory exemption. Contrary to the district court, however, we find that the eligibility rules are mandatory bargaining subjects.[17] Though tailored to the unique circumstance of a professional sports league, the eligibility rules for the draft represent a quite literal condition for initial employment and for that reason alone might constitute a mandatory bargaining subject. *See Caldwell,* 66 F.3d at 529 (describing the mandatory bargaining subject "pertinent" to that case as "the circum-

---

**16.** "To be sure, in sports leagues, unionized players generally engage in individual bargaining with teams. However, it must be emphasized that such individual bargaining is not an exercise of a right to free competition under the antitrust laws; rather, it is an exercise of a right derived from collective bargaining itself." *Caldwell,* 66 F.3d at 528.

**17.** Because we conclude that the eligibility rules are mandatory subjects of collective bargaining, we have no occasion to address whether, or in what circumstances, the non-statutory exemption extends to permissive bargaining subjects. *See Feather v. United Mine Workers,* 711 F.2d 530, 542 (3d. Cir. 1983) ("[Non-statutory exemption] generally applies when a union, acting with a non-labor party, seeks to attain goals which are mandatory or *permissive* subjects of bargaining under the National Labor Relations Act, unless the Union acts with a predatory anti-competitive purpose." (emphasis added and footnote omitted)).

stances under which an employer may ... refuse to hire an employee"); R. Gorman, *Labor Law* at 504 ("In accordance with the literal language of the Labor Act, the parties must bargain about the requirements or 'conditions' of initial employment."). But moreover, the eligibility rules constitute a mandatory bargaining subject because they have tangible effects on the wages and working conditions of current NFL players. Because the unusual economic imperatives of professional sports raise "numerous problems with little or no precedent in standard industrial relations," *Wood*, 809 F.2d at 961, we have recognized that many of the arrangements in professional sports that, at first glance, might not appear to deal with wages or working conditions are indeed mandatory bargaining subjects, *see Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1061 (2d Cir.1995). In *Silverman*, for example, we recognized that "[a] mix of free agency and reserve clauses combined with other provisions [such as a rookie draft and salary caps] is the universal method by which leagues and players unions set individual salaries in professional sports." *Id.* We therefore held that the issues of free agency, an anti-collusion provision in players' contracts, and major league baseball's reserve system are mandatory bargaining subjects in the context of professional baseball. *Id.* Similarly, the complex scheme by which individual salaries in the NFL are set, which involves, *inter alia*, the NFL draft, league-wide salary pools for rookies, team salary caps, and free agency, was built around the longstanding restraint on the market for entering players imposed by the eligibility rules and the related expectations about the average career length of NFL players. The eligibility rules in other words cannot be viewed in isolation, because their elimination might well alter certain assumptions underlying the collec-

tive bargaining agreement between the NFL and its players union.

Furthermore, by reducing competition in the market for entering players, the eligibility rules also affect the job security of veteran players. *See Fibreboard*, 379 U.S. at 210–15, 85 S.Ct. 398 (recognizing union members' "vital concern" in preserving jobs for union members); *see also Intercontinental Container Transp. Corp. v. N.Y. Shipping Ass'n*, 426 F.2d 884, 887–88 (2d Cir.1970) ("[T]he preservation of jobs is within the area of proper union concern[, and u]nion activity having as its object the preservation of jobs for union members is not violative of the anti-trust laws." (internal citations omitted)). Because the size of NFL teams is capped, the eligibility rules diminish a veteran player's risk of being replaced by either a drafted rookie or a player who enters the draft and, though not drafted, is then hired as a rookie free agent. *See* Michael S. Jacobs & Ralph K. Winter, Jr., *Antitrust Principles and Collective Bargaining by Athletes: Of Superstars in Peonage*, 81 Yale L.J. 1, 16 (1971) (recognizing that entry of new players through draft "has an enormous effect on those already in the unit and the collective agreement which governs them"). Consequently, as was true in *Silverman*, we find that to regard the NFL's eligibility rules as merely permissive bargaining subjects "would ignore the reality of collective bargaining in sports." *Silverman*, 67 F.3d at 1061–62.

Clarett, however, argues that the eligibility rules are an impermissible bargaining subject because they affect players outside of the union. But simply because the eligibility rules work a hardship on prospective rather than current employees does not render them impermissible. *See Wood*, 809 F.2d at 960. The eligibility rules in this respect are not dissimilar to union demands for hiring hall arrange-

ments that have long been recognized as mandatory subjects of bargaining. *See Associated Gen. Contractors of America, Houston Chapter,* 143 N.L.R.B. 409, 412, *enforced,* 349 F.2d 449 (5th Cir.1965) (" '[E]mployment' connotes the initial act of employing as well as the consequent state of being employed."). In such hiring hall arrangements, the criteria for employment are set by the rules of the hiring hall rather than the employer alone. *See* R. Gorman, *Labor Law* at 666–70. Nevertheless, such an arrangement constitutes a permissible, mandatory subject of bargaining despite the fact that it concerns prospective rather than current employees. *Wood,* 809 F.2d at 960.

As a permissible, mandatory subject of bargaining, the conditions under which a prospective player, like Clarett, will be considered for employment as an NFL player are for the union representative and the NFL to determine. Clarett, however, stresses that the eligibility rules are arbitrary and that requiring him to wait another football season has nothing to do with whether he is in fact qualified for professional play. But Clarett is in this respect no different from the typical worker who is confident that he or she has the skills to fill a job vacancy but does not possess the qualifications or meet the requisite criteria that have been set. In the context of this collective bargaining relationship, the NFL and its players union can agree that an employee will not be hired or considered for employment for nearly any reason whatsoever so long as they do not violate federal laws such as those prohibiting unfair labor practices, 29 U.S.C. § 201 *et seq.,* or discrimination, 42 U.S.C. § 2000e *et seq. See Reliance Ins. Cos. v. NLRB,* 415 F.2d 1, 6 (8th Cir.1969) ("[Employer is usually free to] pick and choose his employees and hire those he thinks will best serve his business interests."). Any challenge to those criteria must "be founded on labor rather than antitrust law." *Caldwell,* 66 F.3d at 530.

Even accepting that an individual club could refuse to consider him for employment because he is less than three full seasons out of high school, Clarett contends that the NFL clubs invited antitrust liability when they agreed amongst themselves to impose that same criteria on every prospective player. As a consequence of the NFL's unique position in the professional football market, of course, such joint action deprives Clarett of the opportunity to pursue, at least for the time being, the kind of high-paying, high-profile career he desires. In the context of collective bargaining, however, federal labor policy permits the NFL teams to act collectively as a multi-employer bargaining unit in structuring the rules of play and setting the criteria for player employment. Such concerted action is encouraged as a matter of labor policy and tolerated as a matter of antitrust law, *see Williams,* 45 F.3d at 593, despite the fact that it "plainly involve[s] horizontal competitors for labor acting in concert to set and to implement terms of employment," *Caldwell,* 66 F.3d at 529. Multi-employer bargaining in professional sports, moreover, offers the added advantage of allowing the teams to agree with one another and, as required, bargain with the union over the host of uniform rules needed for the successful operation of the league, such as the "[n]umber of games, length of season, playoff structures, and roster size and composition." *Williams,* 45 F.3d at 689. The fact that the challenged rules govern eligibility for the NFL draft, thereby excluding some potential employees from consideration, does not render the NFL's adherence to its eligibility rules as a multi-employer bargaining unit suspect.

The threat to the operation of federal labor law posed by Clarett's antitrust claims is in no way diminished by Clarett's contention that the rules were not bargained over during the negotiations that preceded the current collective bargaining agreement. The eligibility rules, along with the host of other NFL rules and policies affecting the terms and conditions of NFL players included in the NFL's Constitution and Bylaws, were well known to the union, and a copy of the Constitution and Bylaws was presented to the union during negotiations. Given that the eligibility rules are a mandatory bargaining subject for the reasons set out above, the union or the NFL could have forced the other to the bargaining table if either felt that a change was warranted. *See NLRB v. Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Indeed, according to the declaration from the NFLMC's Vice President for Labor Relations, Peter Ruocco, this is exactly what the NFL did.

Although this declaration was the only evidence on this point and went uncontradicted by Clarett below, the district court found that this evidence was insufficient to entitle the NFL to a non-statutory exemption defense as a matter of law.[18] *See Clarett,* 306 F.Supp.2d at 396–97. But even disregarding this evidence entirely, the collective bargaining agreement itself makes clear that the union and the NFL reached an agreement with respect to how the eligibility rules would be handled. In the collective bargaining agreement, the union agreed to waive any challenge to the Constitution and Bylaws and thereby acquiesced in the continuing operation of the eligibility rules contained therein—at least for the duration of the agreement. The terms of that waiver not only keep the eligibility rules in effect for the length of the agreement but also leave the NFL in control of any changes to the eligibility rules on the condition that any significant change potentially affecting the terms and conditions of players' employment would be preceded by notice to the union and an opportunity to bargain. The value of such a clause to the NFL is obvious, as control over any changes to the eligibility rules is left in the hands of management at least until the expiration of the collective bargaining agreement. Although it is entirely possible that the players union might not have agreed entirely with the eligibility rules, the union representative might not have regarded any difference of opinion with respect to the eligibility rules as sufficient to warrant the expenditure of precious time at the bargaining table in light of other important issues.

Clarett would have us hold that by reaching this arrangement rather than fixing the eligibility rules in the text of the collective bargaining agreement or in failing to wrangle over the eligibility rules at the bargaining table, the NFL left itself open to antitrust liability. Such a holding, however, would completely contradict prior decisions recognizing that the labor law policies that warrant withholding antitrust scrutiny are not limited to protecting only terms contained in collective bargaining agreements. *See Brown,* 518 U.S. at 243–44, 116 S.Ct. 2116; *Caldwell,* 66 F.3d at 528–29 & n. 1. The reach of those policies, rather, extends as far as is necessary to

---

18. We do not here address whether the district court was correct to regard the non-statutory exemption as an affirmative defense for which the defendant bore the burden of proof. *Cf. USS–POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council,* 31 F.3d 800, 805 n. 3 (9th Cir.1994) (noting that although defendants typically bear burden of proving entitlement to exception from the antitrust laws, "statutory exemption is not an affirmative defense").

ensure the successful operation of the collective bargaining *process* and to safeguard the "unique bundle of compromises" reached by the NFL and the players union as a means of settling their differences.[19] *Wood,* 809 F.2d at 961. It would disregard those policies completely to hold that some "particular *quid pro quo* must be proven to avoid antitrust liability," *id.* at 962 n. 5, or to allow Clarett to undo what we assume the NFL and its players union regarded as the most appropriate or expedient means of settling their differences, *id.* at 961. We have cautioned before that "[t]o the extent that courts prohibit particular solutions for particular problems, they reduce the number and quality of compromises available to unions and employers for resolving their differences." *Id.* Clarett would have us disregard our own good advice.

The disruptions to federal labor policy that would be occasioned by Clarett's antitrust suit, moreover, would not vindicate any of the antitrust policies that the Supreme Court has said may warrant the withholding of the non-statutory exemption. This is simply not a case in which the NFL is alleged to have conspired with its players union to drive its competitors out of the market for professional football. *See Pennington,* 381 U.S. at 665, 85 S.Ct. 1585. Nor does Clarett contend that the NFL uses the eligibility rules as an unlawful means of maintaining its dominant position in that market. *See Allen Bradley Co.,* 325 U.S. at 809, 65 S.Ct. 1533 ("The primary objective of all the Anti-trust legislation has been to preserve business competition and to proscribe business monopoly."). This lawsuit reflects simply a prospective employee's disagreement with the criteria, established by the employer and the labor union, that he must meet in order to be considered for employment. Any remedies for such a claim are the province of labor law. Allowing Clarett to proceed with his antitrust suit would subvert "principles that have been familiar to, and accepted by, the nation's workers for all of the NLRA's [sixty years] in every industry except professional sports." *Caldwell,* 66 F.3d at 530. We, however, follow the Supreme Court's lead in declining to "fashion an antitrust exemption [so as to give] additional advantages to professional football players . . . that transport workers, coal miners, or meat packers would not enjoy." *Brown,* 518 U.S. at 249, 116 S.Ct. 2116.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is REVERSED and the case REMANDED with instructions to enter judgment in favor of the NFL. The order of the district court designating Clarett eligible to enter this year's NFL draft is VACATED.

---

19. We therefore need not determine whether as a matter of law the Constitution and By-laws that contained the eligibility rules were incorporated by reference into the current collective bargaining agreement.